### WILSON et al. v. CITY OF CHICAGO et al.

*(District Court, N. D. Illinois. March 17, 1890.)*

1 **TOWAGE—LIABILITY OF TUG FOR NEGLIGENCE.**
Libelants' vessel, with a heavy cargo, was being towed by defendant towing company's tug-boat through a draw-bridge across a navigable river. The draw was so obstructed by a grounded vessel that in order to pass it was necessary to take the tow through at a sharp angle. The pier of the bridge was so constructed that the abutment, instead of sloping gradually from the bottom up, rose in a series of stone steps, the corners of which were concealed by the water. Piles coming above the surface of the water had been driven around this abutment to prevent passing vessels from striking, but had just been removed by defendant contractors for the purpose of building another bridge across the river, under a contract with defendant city. The tug took the vessel in tow at such speed that it lost control of her, and she was injured by striking the abutment. *Held*, that the tug company was liable for such injuries, since they were caused by the negligence of the men in charge of its tug.

2. **NAVIGABLE WATERS—BRIDGE CONTRACTORS—NEGLIGENCE.**
The bridge contractors, having taken up the piles which would have protected the vessel, were also liable, whether they knew the mode in which the abutment was constructed or not, since by their contract with the city they agreed to be responsible for any damages the city might have to pay in consequence of their neglect to protect the public against accidents, and thus placed themselves in the same position as was occupied by the city, which was chargeable with notice of the construction of the abutment.

In Admiralty. Libel for damages.
*H. D. Goulder* and *George W. Morgan*, for libelant.
*Schuyler & Kremer*, for Vessel Owners' Towing Company.
*Ball & Oakley*, for Fitzsimmons & Connell Company.

BLODGETT, J. This suit is brought by the owners of the steam-ship Wallula, and the underwriters upon her cargo, to recover for damages sustained by said steam-ship and her cargo from a collision with the south abutment of the Wells Street bridge, in the Chicago river, on the 9th of April, 1888. The original libel made the city of Chicago, the North Chicago Street Railroad Company, the Fitzsimmons & Connell Company, and the Vessel Owners' Towing Company, respondents, charging them all with having contributed to the damage sustained by the libelant; but the suit has since been dismissed as against the North Chicago Street Railroad Company, and was brought to hearing only upon pleadings and proofs as against the remaining respondents.

The proof shows that the steam-ship Wallula, with about 66,000 bushels of oats on board, left the St. Paul elevator, near the junction of the two branches of the Chicago river, soon after dinner-time on the afternoon of the 9th of April, to proceed down the river to the Illinois Central Railroad slips, where she was to take on the balance of her cargo at

the Central elevator. She was in tow of the tugs Carpenter and Van Schaick, belonging to and managed by the Vessel Owners' Towing Company, was not using her own propelling power, and had her rudder lashed amid-ships; the tug Carpenter towing the steamer, and the Van Schaick being fast to her astern, for the purpose of aiding in maneuvring and handling her during the trip. She was drawing about 12½ feet of water astern, and about 10 feet forward. The Fitzsimmons & Connell Company were at the time engaged in removing the old south abutment, preparatory to the construction of the new bridge which the North Chicago Street Railroad Company had, in consideration of certain franchises granted it by the city, agreed to construct across the Chicago river at Wells street. The north draw of the bridge was obstructed by vessels and scows, which lay either within the draw, or so close to it as to make it impracticable to attempt to take the Wallula through it, and just to the west of the entrance of the south draw of the bridge, the course of the river being nearly east and west at that point, a steamer, called by some of the witnesses the "Palmer," and by others the "Coffinberry," lay aground in such a position that it was necessary to take the Wallula around the north side of the vessel, which lay aground, and which made it necessary that the Wallula should enter the draw at a pretty sharp angle, her bow pointing directly toward the south abutment of the old bridge. As the vessel moved forward towards the abutment, and it was seen that she was in danger of striking it, the Carpenter, being the leading tug, made an effort to swing her more to port, so as to prevent her from striking her bow upon the abutment, but, as some of the witnesses say, the steamer seemed to take a sheer, and the efforts of the tug were unavailing to change her course, until she collided with the abutment, striking the bluff of her bow on a projecting corner of the abutment, which, as it was afterwards discovered, broke a hole into the bluff of her bow about five feet below the surface of the water, and damaged her cargo, and required the steamer to go into dry-dock to repair the breach; the injury to the hull also requiring the removal of the portion of her cargo which became wet from water entering the hole in the bow. The proof also shows that, in constructing this south abutment for the old bridge, its base had been made much broader than the portion which stood above the water, and instead of drawing the face of the abutment in from the bottom by a regular slope to the top, so as to give an inclined batter-face, the retraction or narrowing from the base had been by a series of steps, like stairs, under the water, leaving the angles or corners of these steps concealed from observation; and along the face of the abutment, close to its base, parallel with the general course of the stream, there had been driven a row of piling, reaching above the water, and standing in such a manner as to act as fenders to protect the passing vessels from colliding with the abutment, or with these steps or projections below the water. Some of the witnesses seem to think these piles were part of an old coffer-dam, built at the time the abutment was put in; but I think it immaterial whether they were first used as part of a coffer-dam or not, as all seem to agree that they acted as a protection to the

abutment, and prevented vessels from striking upon the base or corners of the abutment, which projected into the channel below the surface of the water. The abutment was also further protected by clumps of piles driven at the corners of it, the tops bound together with chains, so as to make spring fenders or guards to the abutment, and to prevent vessels from colliding against the same. A day or two before the collision in question, the Fitzsimmons & Connell Company, in the prosecution of their work of preparing to put in the substructure of the new bridge, had taken out these fender piles, which were arranged along the face of the abutment, and left no protection against these submerged corners of the abutment, and their men were at work, at the time the Wallula attempted to pass through in removing the clumps of piles at the north-west corner of the abutment. It appears from the evidence that the steamer was swinging and progressing down the stream at the time the bluff of her bow so came in contact with one of the submerged projections or steps of the abutment, and it is quite evident that she must have struck the corner of one of these steps, one of which was about five feet below the surface of the water, and received the injuries complained of by such collision.

It is conceded that the Chicago river is a navigable stream, and that the city of Chicago has the right to construct bridges across the same, subject only to its obligation not to materially interfere with the navigation of the river. And it also appears that the Fitzsimmons & Connell Company, in their contract for putting in the substructure of the new bridge, agreed that they would effectually guard the public from liability to accident in consequence of their operations during the progress of the work of building the bridge, and agreed to be held responsible for any damages the city might have to pay in consequence of neglect on the part of said company to protect the public against such accidents; and said company also agreed to be held responsible for all damages the city might have to pay to private individuals or corporations in consequence of their doings or negligence in connection with said work. It is contended on the part of the libelant that the city is liable for the acts of the contractors in the construction of this bridge, and that, by the removal of these fender piles, the concealed edges and corners of the abutment below the water line had been exposed, so that it was possible for vessels to be brought in contact with and injured by them, and that the act of the contractor in removing these piles is the act of the city itself. It is also contended that the contractors, the Fitzsimmons & Connell Company, were guilty of negligence in the removal of these piles, and that the Vessel Owners' Towing Company, acting through the crews of its two tugs, was also guilty of negligence in carelessly towing the steamer, so as to bring her in contact with the exposed corners of the abutment.

It is quite apparent to me, from the proof, that the injury to the steamer was brought about by the combined effect of the removal of the fender piles from the front of the abutment, and the manner in which the Wallula was handled by the tugs in allowing her to enter the draw at such an angle, and at such a rate of speed that she could not, by the power of the tugs, be prevented from collision with the abutment. It is

insisted on behalf of the Vessel Owners' Towing Company that these corners and edges of the submerged steps or projections to this abutment were concealed obstacles to the navigation of the river, of which the towing company and its men had no knowledge or notice, and that, therefore, the towing company is not responsible for the injury; and that contention might avail if the tugs had not so handled the steamer as to allow her to strike the obstructions which the Fitzsimmons & Connell Company had negligently uncovered.

It is quite clear to me that the removal of this row of fender piles from the front of this abutment exposed craft navigating the river to danger from these projections of the abutment below the water; and it is also clear to me that the steamer would not have collided with these projections if she had been towed straight through the draw, or if her course had been changed after she entered the draw, so as to prevent her from colliding, or, even if she had struck the abutment fairly end on, it is not probable she would have been seriously injured; but the swinging and progressing motion combined brought the bluff of her bow directly against the corner of these steps, concealed below the surface of the water, in just the kind of motion which would cause the corner to do the injury complained of. The witnesses who had the best opportunity to see the affair all agree that when the Wallula came along-side the grounded steamer above the draw she nearly stopped; that the leading tug made a very vigorous pull at her, which seemed to start her ahead quite rapidly, not following the tug, but with a sheer toward the abutment, which the tug was not able, by all its efforts, to prevent, and the collision with the abutment ensued. With the entrance to the draw obstructed by this craft, which lay just above it, it is obvious that the attempt to pass the Wallula through the draw was attended with no little difficulty, and I do not think that the crews of the tugs sufficiently comprehended the peril into which they were taking their tow, and proceeded as carefully as the circumstances required. The Wallula was about 190 feet long over all, and with so much of a cargo on board it required the utmost care on the part of the tugs to pass her through this devious channel without injury. It is very clear that the stern tug contributed but little, if any, aid in steering the Wallula, as, with the steamer aground blocking the passage, she was practically powerless to swing the stern of the Wallula to starboard, and thus help swing her bow to port. It was therefore incumbent on the leading tug to have proceeded all the time at so low a speed as to have the steamer in full control. This she did not do, but allowed the steamer to get away from her, the result of which was the collision and the breach in the Wallula's bow. The negligence, therefore, which I think the proof fastens upon the tug-men was in allowing the Wallula to enter the draw at an angle which must necessarily carry her into contact with the abutment at such a speed as made it impossible for the tug to control or change her direction.

If the fender piles which had been removed by the Fitzsimmons & Connell Company a few days before had been left standing, they would undoubtedly have prevented the steamer from striking the bluff of her

bow upon the projections of the abutment. I conclude, therefore, that the injury to the steamer and her cargo resulted from the joint negligence of the Fitzsimmons & Connell Company in removing these fender piles, and giving no notice or warning to the tug-men of the danger which lurked beneath them, and the mismanagement of the steamer by the tugs which brought her in contact with the exposed corners of the abutment. It is urged on the part of the Fitzsimmons & Connell Company, that they did know of these projections under the water forming the base of the abutment, and I do not think the proof does show that they were aware of the peculiar manner in which the abutment below the surface of the water was constructed; but, by their contract with the city, the Fitzsimmons & Connell Company had placed themselves in precisely the position the city itself occupied in reference to this obstruction of the river. The city is undoubtedly chargeable with notice of the manner in which it constructed this abutment, and the Fitzsimmons & Connell Company, having assumed all the risks of the city in doing this work, must be held chargeable with all the knowledge of the city as to the danger to be avoided. If it would have been negligence for the immediate agents of the city to have removed these fender piles, and thereby exposed these projections of the abutment to contact with craft in the channel, then it was equally negligence for the Fitzsimmons & Connell Company to do so.

My conclusion therefore is that the injury to the Wallula and her cargo was the result of the joint negligence of the Fitzsimmons & Connell Company and the tugs, and that the damages sustained should be divided between them, share and share alike. A decree may therefore be entered finding that the injury to the steamer Wallula occurred through the negligence of the Fitzsimmons & Connell Company and the Vessel Owners' Towing Company, and that each of these respondents shall pay one-half the damage. But, as I am not quite content with the showing which has been made in this regard as to the amount of these damages, the case will be referred to a commissioner to take proof and report the amount of the damages to the vessel and cargo, for which a decree will be entered.