GREAT LAKES TOWING CO. v. KELLEY ISLAND LIME & TRANS-
PORT CO. et al.

KELLEY ISLAND LIME & TRANSPORT CO. v. CITY OF CLEVE-
LAND et al.

(Circuit Court of Appeals, Sixth Circuit. February 8, 1910.)

Nos. 1,878, 1,923.

1. SHIPPING (§ 81*)—INJURY TO VESSEL ON BRIDGE PIER—VIOLATION OF RULES
BY OVERTAKING VESSEL.

When the Ohio, a flat-bottomed steam scow having no very efficient steering apparatus, was near the draw of a bridge across the Cuyahoga river in Cleveland, moving slowly, she was overtaken and passed by the tug Lutz, moving at a much greater speed, which forced her way through the narrow space between the scow and the docks without any signal or agreement. The movement of the water from her passing caused the scow to sheer to port in the draw, which was only 60 feet wide and to strike some submerged timbers around the central bridge pier by which she was so injured that she sank. There was no fault in her navigation. *Held*, that the tug was clearly in fault for violation of rule 25 of the navigation rules for the Great Lakes and their tributaries (Act Feb. 8, 1895, c. 64, 28 Stat. 649 [U. S. Comp. St. 1901, p. 2891]), which prohibits an overtaking vessel from passing another in narrow channels without obtaining her consent, and rule 6 of the inspectors' rules made thereunder.

·. [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 344, 345; Dec. Dig. § 81.*

Overtaking vessels, see note to The Rebecca, 60 C. C. A. 254.]

2. MUNICIPAL CORPORATIONS (§ 751*) — LIABILITY FOR TORTS — DUTIES ABSO-
LUTELY IMPOSED.

A city, vested by statute with control over all public bridges within its limits and the duty of keeping them in repair and free from nuisance, cannot divest itself of such duty or of liability for damages caused by its non-performance by contracting with another to attend to it.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1580; Dec. Dig. § 751.*]

3. MUNICIPAL CORPORATIONS (§ 751*)—LIABILITY FOR TORTS—NEGLIGENCE OF
CONTRACTOR.

A city, given control of all public highways and bridges by statute, entered into a contract for the removal and reconstruction of a bridge across

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

a navigable stream.   In doing the work the contractor removed a line of piles placed around the central pier of the bridge to prevent vessels from coming in contact with it, leaving the ends of submerged timbers used in the foundation projecting beyond the superstructure unguarded and their position unmarked.   Through the fault of another vessel a vessel passing through the draw was caused to sheer, and struck the ends of such timbers and was so injured that she sank.   *Held*, that a provision of the contract requiring the contractor to take all precautions during the work to prevent injury to others did not exonerate the city from liability for the contractor's negligence which was one of the proximate causes of the vessel's injury, and that it was jointly liable with the offending vessel therefor, and each should be required to pay half.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1580; Dec. Dig. § 751.*]

4. COLLISION (§ 130*)—MEASURE OF DAMAGES—LOSS OF USE OF VESSEL.·
Where the owner of a vessel injured in collision substituted others in her place while she was laid up for repairs, an allowance of interest on her value during such time, instead of the profits she might have earned, was not error.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 284; Dec. Dig. § 130.*]

5. COLLISION (§ 130*)—DAMAGES—ALLOWANCE OF INTEREST.
In a suit in admiralty to recover damages for an injury to a vessel in collision, the allowance of interest on the damages awarded from the date of the interlocutory decree fixing the liability, instead of from the time the damages were liquidated as is the usual practice, was within the discretion of the court, especially where the case had been pending for several years, and the larger items of damages were for definite amounts expended and were not disputed.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 284; Dec. Dig. § 130.*]

Appeal from the District Court of the United States for the Northern District of Ohio.

In Admiralty.   Suit by the Kelley Island Lime & Transport Company against the Great Lakes Towing Company and the City of Cleveland.   From the decree libelant and the Great Lakes Towing Company appeal.   Reversed in part.

For opinion below, see (D. C.) 144 Fed. 207.

W. C. Boyle, for Kelley Island Lime & Transport Company.

F. S. Masten, for Great Lakes Towing Company.

Before SEVERENS and WARRINGTON, Circuit Judges, and KNAPPEN, District Judge.

SEVERENS, Circuit Judge.   The Kelley Island Lime & Transport Company, the owner of the steam barge Ohio, filed its libel in the court below charging the respondents, the Great Lakes Towing Company and the city of Cleveland, with having by negligence caused the Ohio to come into collision with a pier of a drawbridge over the Cuyahoga river, a navigable stream running through the city into Lake Erie. The river coming down and passing under the bridge (called in the record the "Middle Seneca Street Bridge"), and going on 220 feet further, makes a sharp turn to the left around a point called the "Knuckle," opposite to which the river spreads out into a bay.   On being

collected again it passes on 440 feet, and then passes under another bridge called the "Lower Seneca Street Bridge." At about 3:30 o'clock of the afternoon of June 25, 1901, the Ohio was passing around the Knuckle going up the river. Her length was 131 feet and her breadth of beam 29 feet. She was a flat-bottomed scow, and had no very efficient steering apparatus. Her course of navigation was effected by her two propellers, one on her starboard and the other on her port side. By reversing that on the port side and operating the other the vessel would be turned to port, and vice versa. It would seem that at that time only the channel on the right hand of the pier was used for navigation. It was narrow, being only about 60 or 65 feet wide. The adjacent shore was lined with docks. At about the time she got turned around and was taking her course up the river and moving slowly, she was passed on the port side by a steam tug of the towing company called the "Goulder," moving much more rapidly. The tug went on under the bridge without materially altering the course of the Ohio, unless perhaps by inducing it slightly more to starboard. Very soon afterwards and when the Ohio was getting near the bridge, the steam tug Lutz, another tug of the towing company, came up astern, and without any signal of any kind pushed on at high speed between the Ohio and the docks on the shore to starboard. The space was narrow. As the tug passed the stem of the Ohio, the latter sheered off to port, and before the tug had got far past, the Ohio collided with the submerged projecting timbers in the foundation of the pier of the drawbridge. These timbers were of oak and 12 inches square. They were laid some three feet below the surface of the water, in an octagonal form. They extended beyond their overlapping joints and projected beyond the perpendicular of the pier, some of them about two feet. It was on one or more of these projections that the Ohio struck. She was broken into to such an extent that she soon after sank. The Cuyahoga river is much less than 500 feet in width. We have mentioned enough of the facts to indicate what the judgment should be in respect to the liability of the towing company for the conduct of the Lutz.

The 25th rule of the regulations prescribed by the Act of February 8, 1895, c. 64, 28 Stat. 649 (U. S. Comp. St. 1901, p. 2891), reads as follows:

"In all channels less than five hundred feet in width no steam vessel shall pass another going in the same direction unless the steam vessel ahead be disabled or signify her willingness that the steam vessel astern shall pass, when the steam vessel astern may pass, subject, however, to the other rules applicable to such a situation."

By the third section of rule 28 authority is given to the Board of Supervising Inspectors to establish further regulations not inconsistent with the act. Among the rules prescribed by the board under this authority are the following:

"Rule 6. When steamers are running in the same direction, and the pilot of a steamer which is astern shall desire to pass on the right or starboard side of the steamer ahead, he shall give one short blast of the whistle, as a signal of such desire and intention and shall put his helm aport; or if he shall desire to pass on the left or port side of the steamer ahead, he shall give two short blasts of the whistle as a signal of such desire and intention, and shall put his helm to starboard, and the pilot of the steamer ahead shall an-

swer by the same signals: or, if he does not think it safe for the steamer astern to attempt to pass at that point, he shall immediately signify the same by giving several short and rapid blasts of the whistle, and under no circumstances shall the steamer astern attempt to pass the steamer ahead until such time as they have reached a point where it can be safely done, when said steamer ahead shall signify her willingness by blowing the proper signals. The boat ahead shall in no case attempt to cross the bow or crowd upon the course of the passing steamer."

"Rule 22. Notwithstanding anything contained in these rules every vessel overtaking any other shall keep out of the way of the overtaken vessel."

"Rule 21. Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse."

Here was a palpable violation of both the statutory and the supervising inspectors' rules. And having regard to the narrow space between the Ohio and the docks through which the Lutz must run and the character of the other vessel and the control she had of herself, the negligence of the Lutz seems wanton. The Ohio was lawfully navigating the river. She was a clumsy craft, but none the less entitled to the protection given her by the rules. The need of a strict regard of them was obvious to the Lutz. She was not only bound to get the consent of the Ohio, but in these circumstances she was bound to slacken her speed to a degree which would enable her to pass the Ohio safely. Instead of this, without even a warning, she pressed into the narrow space and went by her at full speed. There is much conflict in the testimony as to what her speed was, but it leaves no doubt that it was much greater than prudent navigation would permit. The result was what might have been anticipated. The current set up by the displacement of the water on her bow crowded over against the forward starboard of the Ohio, and at the same time the falling back of the water in her wake would suck the after part of the Ohio toward the path through which the Lutz had passed. The Ohio was moving forward. And thus by natural causes, she sheered off to the place of collision. These influences would have a peculiar effect upon the Ohio because of her shallow draft. If she had had a keel down in deep water her movement would not have been so much affected. We therefore concur with the District Court in holding that the liability of the Lutz is clearly established. That being so, and the conduct of the Lutz being of itself sufficient to have caused the disaster, the towage company must make a clear case of fault against the Ohio before it can charge the latter with any part of the consequences. But there is no ground on which to rest an imputation of fault on the part of the Ohio.

But a more serious question arises in the controversy about the liability of the city. And upon this it is necessary to state some further facts. The Seneca Street Bridge had been standing for many years. We have already described the foundation of the pier on which it swung was built, and particularly the submerged projections of its octagonal timbers. For the purpose of shielding the pier from external injury or for the purpose of preventing vessels from colliding with it, or perhaps for both purposes, for it would serve both, the city had long before driven a line of piles a few feet distant from the pier

which projected visibly above the water. Contemplating the rebuilding of the bridge, the city had made a contract therefor with a construction company. This contract included the removal of the pier and replacing it by a new structure. And it seems probable that the removal of the line of piles would be a part of the dilapidations which the construction company would make. There was an express stipulation that all piles should be removed; but this we suppose had reference to the piles driven into the bottom of the river, on which the pier was built. However, the piles were an appurtenant to the pier, and the construction company had a short time before this accident removed the line of piles in order to get at the work of removing the pier. By very full and ample stipulations in the contract, the city had imposed upon the construction company the duty of so executing it that every public interest should be carefully guarded, and, further, that if anything should be done by the construction company which would expose the city to any liability to other persons, the construction company should save the city harmless. Nevertheless it was provided that the work should be done under the supervision of the city engineer and the city inspector. There is no evidence that either of these officials directed the removal of the line of piles. But there is enough to induce the belief that they must have known before the accident that it had been done, or was about to be done. The defense made by the city is that having contracted with a responsible party for the construction of the bridge for due consideration, and enjoined upon that party all needful precaution against doing or suffering to be committed any injury which might happen to others during the progress of the work, and, further, that if the contractor had done the work properly and as required by the contract, this accident would not have happened, the city should not be held liable for the misfeasance of the contractor. The learned judge thought at the trial that the city should be exonerated upon the ground just stated. Afterwards upon a rehearing he held that the taking out of the line of piles was not the proximate cause of the injury which he thought was solely due to the conduct of the Lutz.

As to the first ground, we think the position of the city cannot be sustained. Laying aside for the present the circumstance that the city retained the control of the execution of the contract to the extent that it might have interfered to prevent the removal of the piles until the dangerous structure behind them had been removed, the question remains whether it can absolve itself by employing some one else to do the work upon a stipulation that the employé, whether he be a servant or a contractor, shall observe and perform the duty of the city. In other words, is it an absolute duty or one which may be delegated? We think the city cannot contract itself out of its duty.

By section 2640, Rev. St. Ohio 1890, the duties of municipalities in the state are prescribed as follows:

"The council shall have the care, supervision and control of all public highways, streets, avenues, alleys, sidewalks, public grounds and bridges within the corporation, and shall cause the same to be kept open and in repair, and free from nuisance."

In the case of Faust v. City of Cleveland, 121 Fed. 810, 58 C. C. A. 194, we had before us a case where the appellant had filed a libel in personam against the city to recover damages for an injury to a vessel navigating this same river, occasioned by a snag submerged in the channel of the stream which, it was alleged, it was the duty of the city to have removed. We dealt with the case as one involving the question whether the river was a "highway" within the meaning of the statute above quoted. We held that it was not, and, without further inquiry, affirmed the judgment of the lower court which was for the defendant. But here the controlling fact is that the city was charged with the care, supervision, and control of the offending structure by statute. Its bridges are put upon the same footing as its streets and highways. That the duties incident to the care and control of streets and bridges are personal and absolute and cannot be devolved upon contractors is well settled in Ohio as will be seen by reference to the following decisions of the Supreme Court: Circleville v. Neuding, 41 Ohio St. 465; Covington Co. v. Steinbrock, 61 Ohio St. 215, 55 N. E. 618, 76 Am. St. Rep. 375. Similar decisions have been made by the federal courts. In the very similar case of Wilson v. Chicago (D. C.) in 42 Fed. 506, and on appeal in 63 Fed. 626, 11 C. C. A. 366, the contractors who built the bridge and had guaranteed the proper execution of the work to the city were made parties to the suit, and they and the owners of the tug were held jointly liable. It does not appear how the city escaped, but doubtless because the court worked out the equities between it and the contractors, and imposed the liability upon the latter. See, also, the case of Chicago v. Robbins, 2 Black, 418, 426, 17 L. Ed. 298; Cleveland v. King, 132 U. S. 295, 10 Sup. Ct. 90, 33 L. Ed. 334. The city knew of these submerged timbers for it put them there. And it should not have removed the piles or suffered them to be removed without giving warning to those navigating the river of the danger to which the removal of the piles exposed their vessels.

We are also of the opinion that the contention which the city makes that the removal of these piles was a cause of the injury too remote to subject her to liability, cannot be sustained. It is true that the removal of the piles had already taken place, and that the accident might not have taken place but for wrongful conduct of the tug. But it is also true that if the piles had not been removed the injury to the Ohio would probably have been much less severe. They had the capacity of springs and would cushion the blow. And it is also to be observed that the negligence of the city did not cease to be operative upon the removal of the piles. It was a continuing negligence which would become effective whenever the chance of accident should occur. The negligence of the city and that of the tug were therefore coincident and co-operative, and not remote and proximate, causes of the injury; and in such case both the parties at fault are liable for the consequences. The result is that the owners of the Lutz and the city should be held jointly liable, and each be required to pay one-half of the damages. The decree should go against them jointly, but if one is compelled to pay more than one-half it should be accorded the right of contribution of the excess from the other.

176 F.—32

Two minor questions are raised upon this appeal. One is by the libelant, who complains that it should have been allowed what the Ohio would have earned during the time required for her repair, and by this we understand is meant the loss of profits she would have gained for it during that time. But the libelant substituted other vessels for her in the business in which she was engaged. So the profits were secured. There was no clear proof as to what value for the services of the substituted vessels should be allowed. Instead of making an allowance as and for profits, the commissioner allowed interest on the value of the Ohio, and his action in this respect was confirmed by the court. We see no fair ground for complaint by the libelant.

The other question is whether the court below was right in allowing interest on the damages. The court allowed interest from the date of its interlocutory decree, which was February 5, 1906, down to the entry of the final decree; and the libelant insists that interest should be allowed from the date of the injury. The general rule of law, or practice rather, is to allow interest in cases where the amount of damages is uncertain and is matter for proof, from the date when they were liquidated—that is, fixed by judicial ascertainment—which in this case would be the date of filing the commissioner's report. The date of filing the interlocutory opinion was a year earlier than that. Thus the libelant was allowed a year's interest more than the rate above stated would allow. But the rule is not a fixed one, and is subject to variation by the circumstances. Its application rests in the discretion of the jury, or of the court where it stands in the place of the jury, and the exercise of this discretion will not be reviewed unless it has been palpably abused. The facts of this case are such as to show that the action of the court was not inequitable. The case had been a long time pending, and many of the large items of damages were for definite amounts of expenditure which are not now disputed either in their amount or necessity. The fixing of the date of the interlocutory opinion was, in a large sense, somewhat compensatory for these considerations, and was not an abuse of discretion. This objection must therefore be overruled.

The decree of the court below, in so far as respects the liability of the Great Lakes Towing Company and the city of Cleveland for the damages suffered by the Ohio, should be reversed and, instead thereof, it is directed that a decree be entered in favor of the libelant and against both of the defendants last mentioned in the terms indicated in the foregoing opinion, jointly and severally with a provision that, if either should be compelled to pay more than a moiety of the sum adjudged against both, it may have execution for the excess. The decree of the court below will in other respects be affirmed. The costs in respect to the controversy concerning the liability of the two defendants respectively will be paid to the libelant by the city of Cleveland. The costs incurred by the libelant in the controversy concerning the matter of complaint set up in the cross-appeal will be paid by the Great Lakes Towing Company.