STATE OF MARYLAND, to Use of PRYOR et al., v. MILLER et al.

(Circuit Court of Appeals, Fourth Circuit. December 15, 1911.)

No. 1,022.

1. MUNICIPAL CORPORATIONS (§ 727*)—LIABILITY FOR TORTS—FAILURE TO PERFORM DUTIES IMPOSED BY STATUTE—"POWER"—"AUTHORITY."

Under the law of Maryland, as settled by decision, a legislative delegation of "power and authority" to a municipal corporation, to be exercised for the public benefit or protection, is not permissive merely, but imperative, and imposes a duty and obligation on the municipality for the nonexercise or negligent exercise of which, resulting in private injury, it is liable in damages.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1545; Dec. Dig. § 727.*

For other definitions, see Words and Phrases, vol. 1, pp. 646–648; vol. 6, pp. 5477, 5478; vol. 8, p. 7758.]

2. MUNICIPAL CORPORATIONS (§ 733*)—LIABILITY FOR TORTS—FAILURE TO PERFORM DUTIES IMPOSED BY STATUTE.

Act March 30, 1908 (Laws Md. 1908, c. 148) § 1, confers general powers on the city of Baltimore with respect to the Patapsco river, including the power to make such regulations as it may deem proper respecting wharves, bulkheads, piers, and piling, and the keeping of the same in repair so as to prevent injury to navigation or health, which powers the city assumed to exercise by the passage of an ordinance on April 10, 1909, vesting its harbor board with authority to grant permits for private wharves, etc., and to regulate and supervise their construction and repair. It required permittees to observe such regulations, under penalty, and to indemnify the city against liability for damages by reason of injuries to person or property resulting from negligence on the part of the permittee, and provided for the appointment of officers and agents for the enforcement of its provisions. The harbor board licensed a riparian owner on the river to construct piers in front of his property extending 600 feet into the river, and to connect the outer ends of the same by a bulkhead 700 feet long. In the construction of such work the owner drove rows of piles which for a distance had been cut off two feet below the surface of the water and left wholly unguarded and unmarked, and a motor boat filled with passengers properly navigating the river struck such submerged piles and was sunk; a number of the passengers being drowned, and others injured. The city had taken no precautions whatever to supervise the construction of the work or to see that it was done with due regard to the safety of those lawfully navigating the river. Held, that under the law of the state the city was liable in damages to the persons so sustaining injuries as the result of its failure to perform such duties which were imposed on it by the statute.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1547–1549; Dec. Dig. § 733.*]

3. ADMIRALTY (§ 18*)—TORTS—LIABILITY UNDER ADMIRALTY LAW—NEGLIGENT OBSTRUCTION OF NAVIGABLE STREAM.

A city vested by statute with authority to license, regulate, and supervise structures in a navigable river is liable under the admiralty law for

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

injuries to persons or vessels lawfully navigating the river caused by obstructions negligently created in the building of a structure which it authorized and which it was its duty to supervise.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 206–221; Dec. Dig. § 18.*]

Cross-Appeals from the District Court of the United States for the District of Maryland, at Baltimore.

Suit in admiralty by the State of Maryland, to the use of James V. Pryor and Annie M. Pryor, parents of Frank S. Pryor, deceased, James H. Pryor, and others, against Andrew Miller and Kunigunda Miller, the Mayor and City Council of Baltimore and the Board of County Commissioners of Baltimore County. Cross-appeals from a decree for libelants against respondents Miller only (180 Fed. 796). Reversed on libelants' appeal as to Mayor and City Council of Baltimore; otherwise affirmed.

H. N. Abercrombie and Arthur L. Jackson (Robert H. Smith, Raymond S. Williams, Jacob S. New, and Philip B. Watts, on the brief), for James V. Pryor and others.

John H. Richardson and George Washington Williams, for Andrew Miller and Kunigunda Miller.

S. H. Lauchheimer (Edgar Allan Poe, German H. H. Emory, and Charles A. Marshall, on the brief), for Mayor and City Council of Baltimore.

Arthur D. Foster (James J. Lindsay and John S. Biddison, on the brief), for Board of Com'rs of Baltimore County.

Before GOFF, Circuit Judge, and WADDILL, District Judge.

WADDILL, District Judge. This is an appeal and cross-appeal from a decree of the United States District Court for the District of Maryland, rendered on the 24th day of June, 1910. A brief summary only of the facts will be stated, relying upon the opinion of the learned judge of the lower court (180 Fed. 796) for a full statement and elaboration of the same.

Kunigunda Miller, the wife of Andrew Miller, one of the libelants here, owned a tract of some eight acres of land on the waters of the Patapsco river, near the city of Baltimore, at Willow Grove, Dundalk, Baltimore county, Md. Through her said husband, on the 6th day of June, 1906, she made application to the harbor board of the mayor and city council of the city of Baltimore, for a permit to build a bulkhead into the Patapsco river, which was duly granted; previous leave having been given on the 16th of March of the same year, by the same board, to build a platform pier within the inclosure of the bulkhead. This bulkhead extended out into the river from the northern and southern lines of said tract of land, approximately at right angles thereto, some 600 feet, and the purpose was to connect the offshore ends of these bulkheads with each other, a distance of some 700 odd feet, by the construction of another bulkhead, which would be substantially parallel to the shore line, called in the record the western bulkhead, the other two being the northern and southern bulkheads,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

respectively, thus forming a sheltered lagoon or harbor, of some eight acres, the ultimate purpose being to fill in the lagoon, and make an addition of eight acres of land to the mainland, when filled in as was contemplated would be done in the future. Pursuant to this plan, by the summer of 1909, the south bulkhead was about completed, and work had been begun on the west bulkhead at its intersection with the south bulkhead, and four rows of piles had been driven northward for something over half the length of the western end. These piles had not been cut off on the 5th day of August, 1909, the date of the accident, and on that day all the piles forming the north bulkhead had been driven, for some 175 feet or thereabouts from the shore, they had been cut off, capped, and a platform placed over them; the next 200 feet or thereabouts had been cut off, and not capped on the day of the accident, and were from one foot to fifteen inches below the surface of the water, and from the end of this open space to the outshore end, a distance of about 200 feet, piles were still standing as they had been originally driven, and projected from two to six feet above the water; thus leaving the west end of the lagoon, from about the middle thereof to the northern end, unobstructed, and without any piles, and the northern line of the bulkhead commencing some 200 feet from its outshore end, submerged under the water for a distance of about 200 feet, leaving an open sheet of water, through which the launch, the accident to which is the subject of this litigation, endeavored to navigate, in ignorance of the submerged piles referred to. Nothing lay between this bulkhead construction and the channel of the Patapsco river, except an open expanse of navigable water, over which tugs, drawing from six to nine feet of water, habitually navigated in passing in and out of said lagoon. The premises of Miller had been fitted up as a pleasure park and resort, and were used as picnic grounds by Sunday school parties and others, the place being a short distance from Baltimore, and connected directly with the city street car system. On the day of the accident, a Sunday school picnic of the Waverly Baptist Sunday School, occupied the grounds, and one of the libelant's intestates, J. G. Pryor, came to the picnic grounds in a small gasoline motor boat, having entered the lagoon from its western end, that is, through the opening caused by the lack of completion of the western bulkhead, which was used for the purpose of affording water ingress. The launch was 27 feet long, and 6 feet 6 inches beam, drawing from 18 to 24 inches of water. Pryor observed other launches within the lagoon, and he invited the superintendent of the Sunday school and others to go with him for a short trip on the water. He took his launch through the opening of the west bulkhead, and returned the same way. He subsequently invited others, and, on his second and fatal trip, there were 18 persons, 11 adults and 7 children, the latter ranging from an infant, to boys and girls of about 15 years of age. The launch was not crowded; there was scarcely any wind, and the water was smooth; and upon starting Miller was on his wharf about to get in his own launch, and said nothing to Pryor, or, indeed, to any one, about the submerged piles. The course that Pryor desired to navigate on his second trip took him through the open space in the north

bulkhead, which appeared to be an opening straight out to the channel. His craft, as it seems other shipping without his knowledge had previously 'done, struck upon the submerged piles, causing the accident complained of; and as a result five persons, two adults and three children (one of whom was the engineer and brother of the owner of the launch), were drowned, and another adult seriously injured.

Original libels and intervening petitions were duly filed against Andrew Miller and his wife, the mayor and city council of Baltimore, a body corporate duly incorporated by the Legislature of Maryland, and the board of county commissioners of Baltimore county, in the state of Maryland, and upon appropriate pleadings and proofs being had and taken, the decree complained of was entered by the lower court. The decision of that court was that the cause of action was one properly cognizable in an admiralty court, that Miller and wife were liable to libelants for the damages sustained, and that the mayor and city council of Baltimore and the board of county commissioners of Baltimore county were not responsible therefor. From this decision, relieving the parties last named, the libelants and intervening petitioners appealed, and Miller and wife likewise appealed from the decree against them.

It is as to the correctness of the decision thus rendered by the lower court that we have to pass. The conclusion reached by us, for the reasons stated in an able and elaborate opinion filed by the learned judge of the lower court (180 Fed. 796, supra), finding the facts and giving his views on the law applicable thereto, is that the lower court was plainly right in holding that the cause of action was one properly cognizable within the admiralty and maritime jurisdiction of the courts of the United States; that Miller and wife were liable for the losses sustained; and that the county commissioners of Baltimore county were free from fault. We are unable, however, to concur with the lower court as to the nonliability of the mayor and city council of Baltimore. This latter question was fully considered by the lower court, which, after quoting from the case of Mayor & City Council of Baltimore v. Marriott, 9 Md. 174, 66 Am. Dec. 326, commented thereon, and on other cases there referred to, as follows:

"In that case the city was held liable to an individual who had slipped on the ice which had been allowed to accumulate on one of the city's sidewalks. There was a city ordinance which required the removal of snow and ice. The city had made no attempt to enforce it. The principle stated in Marriott's Case is still the recognized law in Maryland.

"A municipality which does not prevent boys from making a practice of coasting on its streets is liable for injuries occasioned by their sleds. Taylor v. Mayor of Cumberland, 64 Md. 68, 20 Atl. 1027, 54 Am. Rep. 759.

"When it allowed 'cows armed with dangerous horns and equipped with annoying bells' to wander in its streets, it was liable for injuries occasioned to a passer-by who was 'violently horned, tossed, thrown and trampled upon.' Cochrane v. Frostburg, 81 Md. 54, 31 Atl. 703, 27 L. R. A. 728, 48 Am. St. Rep. 479.

"It is liable to a foot passenger knocked down by a bicycle when it had permitted bicycle riders, in spite of a municipal ordinance to the contrary, to ride on the streets and sidewalks at an immoderate rate of speed. Hagerstown v. Klotz, 93 Md. 437, 49 Atl. 836, 54 L. R. A. 940, 86 Am. St. Rep. 437.

"The libelants assert that a submerged obstruction in navigable water is in itself a nuisance. They rely on Harmond v. Pearson, 1 Campbell, 515. In that case Lord Ellenborough said: 'It is a peremptory law of navigation that,

when any substance is sunk in a navigable river so as to create danger, a buoy should be placed over it for the safety of the public.' The same rule was laid down in Philadelphia, Wilmington & Baltimore R. R. Co. v. Philadelphia & Havre De Grace Steam Tow Boat Co., 23 How. 217, 16 L. Ed. 433.

"Their contention, therefore, may be briefly summed up as follows: The submerged pile was a nuisance. The city was given power to compel its removal. The city did not exercise reasonable diligence or any diligence whatever to cause the pile to be removed, and is liable.

"It will be noticed that all these Maryland cases are cases in which the city failed to keep its streets and highways free of nuisance. A similar rule has been applied to county roads and bridges. County Commissioners of Anne Arundel County v. Duckett, 20 Md. 468, 83 Am. Dec. 557.

"The language in which the principle is stated, it is true, is broad enough to render the city liable for things other than those which affect the use of its streets, but I do not find in any of the authorities cited, or with which I am familiar, that in point of fact this liability for the simple nonuse of powers given to it has in point of fact ever been extended beyond the class of cases above mentioned."

It will be observed from this extract from the lower court's opinion, and the cases there given, and others might be cited, that under the laws of the state of Maryland, its cities are liable for failure to keep their streets and highways free of nuisance, and the same is admitted to be true as to the public roads and bridges of the state, which latter liability is one at least that many of the states of the Union do not recognize. The court proceeds, however, upon the theory that the city is not liable for a nuisance arising from a submerged obstruction in the waters of the Patapsco river, because the river itself is not a highway in the sense of the Maryland decisions. Technically this may be true of rivers of the state generally, where there had been no legislation by the state conferring special power and authority upon the cities over their waters, or respecting which the cities themselves, pursuant to such delegation of power, had not exercised authority. Where such action has been taken, as in this case, in our judgment, a very different question is presented, and it is as to a case arising under such circumstances that we have to pass, as well as to determine the city's liability in the premises, in a court of admiralty. The General Assembly of the state of Maryland, by act of 30th of March, 1908 (chapter 148 of the Public General Laws) entitled "Harbors, Docks and Wharves," provided:

"Section 1. Be it enacted, * * * the mayor and city council of Baltimore shall have full power and authority to provide for the preservation of the navigation of the Patapsco river and tributaries, including the establishment of lines throughout the entire length of said Patapsco river and tributaries, beyond which lines no piers, bulkheads, wharves, pilings, structures, obstructions or extensions of any character may be built, erected, constructed, made or extended; to provide for the improving, cleaning and deepening of said river and tributaries, and the removal therefrom of anything detrimental to navigation or health; to provide for and regulate the stationing, anchoring and moving of vessels, or other water craft, and to prevent any material, refuse or matter of any kind from being thrown into, deposited in or placed where the same may fall or be washed into said river or tributaries; to make surveys or charts of the Patapsco river and tributaries, and to ascertain the depth and course of the channel of same, and if necessary affix buoys or water marks for facilitating and rendering more safe the navigation and maintenance of and to make such regulations as it may deem proper respecting wharves, bulkheads, piers and piling and the

keeping of the same in repair so as to prevent injury to navigation or health; to regulate the use of public wharves, docks, piers, bulkheads or pilings, and to lease or rent the same, and to impose and collect dockage from all vessels and other water craft lying at or using the same, and to collect wharfage and other charges upon all goods, wares, merchandise or other articles landed at, shipped from, stored on or passed over the same; to provide for the appointment of such officers and employés as may be necessary to execute the aforegoing powers, and to impose fines or penalties for a breach of any ordinance passed in conformity herewith, said fine not to exceed $200 for any one offense.

"Section 2. * * *"

Pursuant to this act, on the 10th day of April, 1909, an ordinance was duly passed by the city of Baltimore, the sections of which specially applicable to this case are as follows:

"Sec. 11, Wherever the same may be proper and necessary the harbor board shall cause public wharves or bulkheads to be built or repaired at any water front property of the city. The harbor board shall require all private wharves or bulkheads that are decayed or defective, or likely to be injurious to navigation or to health, to be rebuilt or repaired within a reasonable time to be prescribed in a written notice (not less than thirty days) to be served on agent, owner or occupier of such wharf or bulkhead, and the owner of any water front property on the Patapsco river or tributaries shall cause the same to be secured and protected in such manner as the harbor board may think proper and may direct, and if the owner is a minor, or cannot be found, the harbor board shall have such property secured and protected at the expense of the owner to be recovered by the mayor and city council in due course of law; any person who fails to comply with the requirements of this section shall pay a fine of ten dollars for every day of non-compliance."

"Sec. 18. All work under a permit issued by the harbor board shall be done in accordance with the rules and regulations of the department and in accordance with plans and specifications submitted by the permittee and wholly at the expense of the permittee. The permittee shall indemnify and save harmless the mayor and city council of Baltimore, its officers, agents and servants, against and from all damages, cost and expense which they may suffer, or to which they may be put by reason of injury to the person or property of another resulting from carelessness or negligence on the part of the permittee. The procedure under the permit issued by the harbor board shall be in strict compliance with all applicable laws and ordinances and the rules and regulations of the city departments established for the purpose of enforcing them; and the harbor board shall have the right to revoke a permit at any time."

"Sec. 31, No material, refuse or matter of any kind shall be thrown into, deposited in or placed where the same may fall or be washed into the Patapsco river, or any of its tributaries, without written permission from the harbor board, which is hereby authorized to employ supervisors to see that any material permitted to be deposited is placed where directed by said board, and the person applying for or receiving said permission shall pay for the services of said supervisors such rates as the harbor board may deem proper. Any person violating this section shall pay a fine of not more than two hundred dollars, and the harbor board and harbor masters are specially charged with the execution of this section."

It will thus be seen that as to the Patapsco river, the city of Baltimore not only had conferred upon it the power to provide for the preservation of the navigation of it and its tributaries, and the removal therefrom of anything detrimental to navigation or health, but to authorize the erection and maintenance of, and to make such regulations as it deemed proper, respecting wharves, bulkheads, piers, and piles, and the keeping of the same in repair, so as to prevent injury to navi-

gation or health; and the city was further given authority to "provide for the appointment of such officials and employés as may be necessary to execute the aforegoing powers, and to impose fines and penalties for the breach of any ordinances passed in conformity with the act."

[1] This state statute clearly defined the power and authority of the city of Baltimore over the waters in question, at the scene of the accident, and the ordinances pased in pursuance thereof show the authority exercised by the city under the delegation of the power from the state, leaving alone for the consideration of the court the determination of the liability of the city in the premises. The authorities of the state of Maryland regarding liability for injury arising from nuisance upon its public highways, caused by the neglect of cities, and holding the cities responsible therefor, are many in number, and clear and comprehensive in character. Mayor & City Council of Baltimore v. Marriott, 9 Md. 160, 174, 66 Am. Dec. 326; Taylor v. Cumberland, 64 Md. 68, 20 Atl. 1027, 54 Am. Rep. 759; Cochran v. Frostburg, 81 Md. 54, 31 Atl. 703, 27 L. R. A. 728, 48 Am. St. Rep. 479; Hagerstown v. Klotz, 93 Md. 437, 49 Atl. 836, 54 L. R. A. 940, 86 Am. St. Rep. 437; Havre De Grace v. Fletcher, 112 Md. 562, 570, 77 Atl. 114. From the language of the legislative act, there can be no less doubt of the duty imposed on the city than of the consequences of its failure to perform the same. The meaning of language similar to that used in the act was passed upon by the Supreme Court of Maryland, in the case of Baltimore v. Marriott, 9 Md. 160, 174, 66 Am. Dec. 326, in construing a provision of the then charter of the city. There the provision was to the effect that the city of Baltimore should have "full power and authority" to pass all laws and ordinances necessary to preserve the health of the city, and to prevent and remove nuisances, etc., and the court held that when the statute conferred power upon the corporation, to be exercised for the public good, the exercise of the power was not merely discretionary, but imperative, and that the words "power" and "authority" meant duty and obligation. This rule, construing the granting of power and authority by the Legislature to the cities, has been affirmed frequently by the Court of Appeals of Maryland, and as late as the year 1910, the Marriott Case, supra, was approved; the court saying:

"We are of the opinion that the effect of the provision in the statute just cited, was to place the corporation of Baltimore City in regard to their obligations to prevent and remove nuisances, upon the same footing which is held by individuals and private corporations." Havre de Grace v. Fletcher, 112 Md. 562, 570, 77 Atl. 114, 117.

[2] In this case, the city of Baltimore, expressly authorized the building out into the public navigable waters of the Patapsco river, from each of the northern and southern boundary lines on the shore line of respondent Miller's land, extending some 600 feet, bulkheads, piers, and other obstructions, and authorizing the connection of the outshore ends of these obstructions, by building a connecting stringer or bulkhead in said river, where its waters were constantly used by persons lawfully engaged in commerce, with vessels of six to nine feet draft, and took no precaution whatever, either to superintend the con-

struction of the work, or to see that those permitted to do it properly did the same, having regard to the safety of navigators thereon; and that, too, in face of the fact that the city had full power and authority to appoint the necessary officials and employés to provide for the supervision of such work, and to impose fines and penalties for failure to comply with its orders; and, moreover, its own ordinance contemplated the fullest protection to the city from damage growing out of the permission given by it in respect to the building or repair of wharves, bulkheads, piers, or piling in said river, the ordinance being:

"The permittee shall indemnify and save harmless the mayor and city council of Baltimore, its officers, agents and servants, against and from all · damages, costs and expenses, which they may suffer, or to which they may be put, by reason of injury to the person or property of another, resulting from carelessness or neglect on the part of the permittee."

This action of the mayor and council clearly indicated their understanding as to the city's liability for actions such as the one at bar, and hence provided for indemnity of the city against suit or damage arising from the neglect of those given permission to obstruct the navigable waters under their control. The city chose to give the authorization to place the obstruction in the river, and took no step looking either to the manner in which the work was to be done, or to inspect, supervise, or in any respect look after the same, so far as its safety to mariners was concerned, or to indemnify itself against harm incident to the negligent construction of the same, and under such circumstances should not be allowed to escape responsibility for injury arising to others innocently and lawfully using such waters, caused by the city's omission, and the negligence of those permitted by it to place such hidden obstruction in a public waterway. Indeed, there can be but little reason why the city should be held less liable for injury from a nuisance of the character in question placed or allowed to remain in the waters of the Patapsco river, with its knowledge, or opportunity of knowledge, or by and with its authority and consent, than for one caused by a nuisance allowed upon a public highway or street of the city; and this is certainly true in a court of admiralty, where those lawfully using such waters have innocently sustained injuries from such neglect, however much it may appear that, as between the city and its permittee, the latter would be primarily liable.

The question of the nonliability of a municipal corporation for its acts of a legislative character, and which it exercises as a part of the · sovereign power, and those private franchises which belong to it as a creature of the law, is one which has been much discussed in the authorities, and the same is stated in different ways; but we know of no decision that makes clearer what is the obligation for which the city is or is not liable, than that of the Court of Appeals of Maryland, in County Commissioners v. Duckett, 20 Md. 468, 478 (83 Am. Dec. 557); the court there saying:

"With regard to the liability of a public municipal corporation for the acts of its officers, the distinction is between the exercise of those legislative pow-, ers which are imposed for public purposes, and as a part of the government of the country, and those private franchises which belong to them as a creature of the law. Within the sphere of the former, it enjoys the exemption · of the government."

In that case, the county was held liable for its failure to keep a public road in safe condition to travel over; the court laying down the criterion of liability as follows:

"The conditions necessary to constitute legal liability are a duty imposed by law, with the means and agents at their command to execute it, and capacity to sue and be sued imposed by the act of their creation."

The learned judge of the court below, in support of his views, cites the cases of Gullikson v. McDonald, 62 Minn. 278, 64 N. W. 812; Ogg v. Lansing, 35 Iowa, 498, 14 Am. Rep. 499; Boehm v. Baltimore, 61 Md. 265; Coonley v. Albany, 132 N. Y. 149, 30 N. E. 382; Goodrich v. Chicago, 20 Ill. 447; Winpenny v. Philadelphia, 65 Pa. 137; and Faust v. Cleveland, 121 Fed. 810, 58 C. C. A. 194. In the main, these cases are clearly distinguishable from the one at bar. The first involved the right of an individual to recover against the city for the defective condition of a station house, and hence within the doctrine of the city's police power; the second, the failure of the city to carry out a health ordinance, and damage arising from exposure to smallpox, likewise within the police power of the city; the third, for refusal to issue a permit in connection with the removal of matter dangerous to the health of the city; and, the fourth, Coonley v. City of Albany, 132 N. Y. 149, 30 N. E. 382, largely inapplicable here by reason of the difference between the New York and the Maryland law regarding liability for causes of action of the character in question. This latter case, however, is one of interest because of the fact that it grew out of an attempt to compel the city of Albany to remove a sunken boat in the Hudson river, and the court says:

"If the statute of this state had laid on Albany the command in the same terms (i. e., as in the Winpenny Case) as to navigable rivers, we should not hesitate to follow the decision in a case founded on neglect of performance resulting in injury."

The fifth case, Goodrich v. Chicago, 20 Ill. 457, one very similar to this, the court, without citing authorities to support its view, based its conclusions upon the fact that the Legislature did not intend to require the city to carry out the provision with respect to the Chicago river, because of the expense, difficulty, and extent of the work. In the sixth case, Winpenny v. Philadelphia, 65 Pa. 137, is found express authority for the views herein contained. The statute in that case placed the direct duty upon the city with regard to navigable waters, in language no clearer or more definite than used in this case; and the city was held liable. In this connection, it may be said that the rule as to liability for injuries arising from usage of defective public highways in Pennsylvania is the same as in Maryland, and hence gives to decisions from the courts of that state special weight. The seventh case, Faust v. Cleveland, will be referred to in connection with the rule in admiralty applicable to this class of cases.

[3] In what we have said thus far, we have had regard more particularly to the city's liability at law, for causes of action such as the one involved in this case. We will refer briefly now to the admiralty doctrine on the subject. Two cases from the Circuit Court of Appeals of the Sixth Circuit (Faust v. Cleveland, 121 Fed. 810, 58 C. C. A. 194,

and Great Lakes Towing Co. v. Cleveland, 176 Fed. 492, 100 C. C. A. 109) bearing upon the subject under consideration in admiralty were much relied upon in argument, the first named by the city of Baltimore, and the last named by the appellants. The first case, in our judgment, having regard to its peculiar facts and circumstances, and in the absence of a statute such as we have here, does not militate especially against the views contended for by the appellants herein; the Circuit Court of Appeals in the last case saying of that decision:

"In the case of Faust v. City of Cleveland, we had before us a case where the appellant had filed a libel in personam against the city to recover damages for an injury to a vessel navigating the same stream, which, it was alleged, it was the duty of the city to have removed. We dealt with the case as one involving the question whether the river was a 'highway' within the meaning of the statute above quoted. We held that it was not, and, without further inquiry, affirmed the judgment of the lower court, which was for the defendant. *But here the controlling fact is that the city was charged with the care, supervision, and control of the offending structure by statute.* * * * The city knew of these submerged timbers, for it put them there. And it should not have removed the piles, or suffered them to be removed, without giving warning to those navigating the river of the danger."

In the latter decision (176 Fed. 492, 100 C. C. A. 109) the views expressed strongly support the contention of appellants here that the city, under the circumstances of this case, is liable. The Supreme Court of the United States in Workman v. New York, 179 U. S. 552, at pages 557, 558, 21 Sup. Ct. 212, at page 214 (45 L. Ed. 314), has recently had under review this entire doctrine arising in cases in admiralty, and from which decision it would appear that the court holds that even the nonliability of a city by reason of the exercise of its governmental functions does not serve to relieve it from liability, where the cause of action is one maritime in character, and properly maintainable in an admiralty court; the court, through Mr. Justice White, saying:

"The proposition then which we must first consider may be thus stated: Although by the maritime law the duty rests upon courts of admiralty to afford redress for every injury to person or property where the subject-matter is within the cognizance of such courts and when the wrongdoer is amenable to process, nevertheless the admiralty courts must deny all relief whenever redress for a wrong would not be afforded by the local law of a particular state or the course of decisions therein. And this, not because, by the rule prevailing in the state, the wrongdoer is not generally responsible and usually subject to process of courts of justice, but because in the commission of a particular act causing direct injury to a person or property it is considered, by the local decisions, that the wrongdoer is endowed with all the attributes of sovereignty, and therefore, as to injuries by it done to others in the assumed sovereign character, courts are unable to administer justice by affording redress for the wrong inflicted.

"The practical destruction of a uniform maritime law which must arise from this premise is made manifest when it is considered that, if it be true that the principles of the general maritime law giving relief for every character of maritime tort where the wrongdoer is subject to the jurisdiction of admiralty courts can be overthrown by conflicting decisions of state courts, it would follow that there would be no general maritime law for the redress of wrongs, as such law would be necessarily one thing in one state, and one in another; one thing in one part of the United States, and a different thing in some other part. As the power to change state laws or state decisions rests with the state authorities by which such laws are enacted or decisions

rendered, it would come to pass that the maritime law affording relief for wrongs done, instead of being general and ever abiding, would be purely local—would be one thing to-day and another thing to-morrow. That the confusion to result would amount to the abrogation of a uniform maritime law is at once patent. * * * (At page 559 of 179 U. S., at page 214 of 21 Sup. Ct. [45 L. Ed. 314]). The disappearance of all symmetry in the maritime law and the law on the other subjects referred to, which would thus arise, would, however, not be the only evil springing from the application of the principle relied on. since the maritime law which would survive would have embedded in it a denial of justice. This must be the inevitable consequence of admitting the proposition which assumes that the maritime law disregards the rights of individuals to be protected in their persons and property from wrongful injury, by recognizing that those who are amenable to the jurisdiction of courts of admiralty are nevertheless endowed with a supposed governmental attribute by which they can inflict injury upon the person or property of another, and yet escape all responsibility therefor. It cannot be doubted that the greater part, if not the whole, of the maritime commerce of the country is either initiated or terminated in ports where municipal corporations exist. All the vessels, whether domestic or foreign, in which this vast commerce is carried on, under the rule referred to, could be subjected to injury and wrong without power to obtain redress, since every municipality would be hedged about with the attributes of supreme sovereignty." Workman v. New York, 179 U. S. 552, supra, and especially pages 557, 558 and 559, 21 Sup. Ct. 212, at page 214, 45 L. Ed. 314.

This case, however, does not require us especially to enter upon a discussion of that question, or to go to the extent that the Supreme Court did in the Workman Case, since here we have clearly a case of injury arising not from the exercise of the city's governmental functions, but because of default in one of its private obligations incurred as a creature of the law, and moreover, one for which, as before stated, liability would exist at law, and hence in a court of admiralty, where less harsh and stringent rules should prevail, certainly responsibility cannot be escaped.

It follows, from what has been said, that the decree of the lower court, in so far as it holds the cross-appellants, Miller and wife, liable, and relieves the county commissioners of Baltimore county from responsibility, should be affirmed, and that so far as it relieves the city of Baltimore from liability, it should be reversed, with costs to the appellants in this court against said Miller and wife, and the city of Baltimore, and with costs to the county commissioners of Baltimore county against the appellants and cross-appellants.

The case will be remanded, with directions to the court below to proceed further therein, as indicated by the views herein set forth.