**THE FREDENSBRO.**
**THE MANCHESTER SHIPPER.**

District Court, E. D. Pennsylvania.
Feb. 24, 1930.

502

William J. Conlen, of Philadelphia, Pa., for the Fredensbro.

H. Alan Dawson, of Philadelphia, Pa., for the Manchester Shipper.

Fraley & Paul, of Philadelphia, Pa., for John Kelly, Limited.

THOMPSON, District Judge.

This suit arose out of a collision between the British steamship Manchester Shipper and the Danish steamship Fredensbro on the Delaware river between Philadelphia and Camden, N. J., as a result of which the Fredensbro with her cargo was sunk and the Shipper sustained damage to and about her stem. A libel was filed by the master of the Fredensbro against the Shipper and a cross-libel by the owner of the Shipper against the Fredensbro. John Kelly, Limited, claiming as owner of the cargo of the Fredensbro, filed a libel against the Shipper, whereupon the Shipper impleaded the Fredensbro under Admiralty Rule 56 (28 USCA § 723).

There is a established anchorage ground on the eastward side of the river extending about halfway across and marked at its upper western limit by a white buoy. The river is, at the place of the collision, about 2,000 feet wide, so that there is a width of between 900 and 1,000 feet between the anchorage ground and the ends of the piers along the western shore.

On October 27, 1926, the Fredensbro, having taken on at Port Richmond a full cargo of coal consigned to John Kelly, Limited, had anchored over night on the westward side of the anchorage ground approximately opposite Pier 78 South Wharves. Other steamships were anchored in about a fore and aft line along the westward side of the anchorage ground. The Italian ship Vesuvio was lying about opposite Pier 78. Some distance above the Vesuvio was a Norwegian steamship, and below the Vesuvio a British steamship, all tailing downstream with the tide, which was at about the last of the ebb.

The Fredensbro, having taken on a pilot, weighed anchor at about 12:30 p. m. preparatory to proceeding down the river to sea. The weather was clear, the wind negligible, and the current running at about a half knot an hour. The Fredensbro left her anchorage on a starboard helm, headed toward the westward side of the river, then northward. After taking that course as far as the pilot considered necessary, she swung out into the river on a port helm and then executed backing and filling movements until the vessel was brought to a point about opposite Pier 78 and was lying 50 or 100 feet out from the pierhead, approximately broadside to the stream.

At the same time, the Manchester Shipper, bound for Port Richmond, was coming up the river on the eastward side of the channel and close to the westward side of the anchorage ground at sufficient distance to clear the anchored vessels. The Fredensbro had been sighted by the Shipper when the latter came around Horse-Shoe Bend, and the Shipper was sighted by the Fredensbro when the latter was 3,000 feet below her. The Shipper was proceeding upstream against the ebb tide at about four and a half knots an hour. When the Shipper was about 3,000 feet below the Fredensbro, a tug with a hoister lashed to her side was above the Fredensbro coming downstream. The tug with her tow passed the Fredensbro on a course across her bow, about 150 feet off. Immediately before the tug passed her, the Fredensbro gave two blasts of her whistle, intended as a starboard to starboard passing signal to the Manchester Shipper, to execute which maneuver the Shipper would have been obliged to go westward under her stern and between the Fredensbro and the pier. The Fredensbro, as the tug passed her, started her engines slow ahead, intending to get far enough across the stream to complete her maneuver of going about to proceed to sea.

The Shipper at about the same time, or immediately thereafter, blew one blast of her whistle, indicating her intention to keep her course and to pass the Fredensbro on the eastward side of the channel. The Shipper was then only about 1,200 feet below the Fre-

densbro. The Shipper sounded another single blast and kept on her course. Meanwhile the Fredensbro had started full speed ahead, and, a collision being imminent, her engines were reversed to full speed astern. The Shipper also put her engines full speed astern, but the action on the part of each vessel was too late to avoid a collision and the stem of the Shipper struck the starboard side of the Fredensbro, cutting into her starboard side forward of her bridge.

The collision occurred immediately above the Vesuvio. When the vessels were disengaged, the Shipper scraped the side of the Vesuvio. The Fredensbro drifted ahead to the anchorage grounds and sank.

The testimony on the part of the Shipper is that the master and those with him on the bridge did not hear the two-blast signal of the Fredensbro. The testimony further shows that she had no lookout in the ordinary sense of the term. The chief officer and the carpenter were stationed at the forecastle head to stand by the anchor. Although the chief officer heard the blast signals of the Fredensbro, he did not report them to the bridge.

There was testimony on the part of the Shipper from which it is contended that, in view of the presence of the tug and hoister passing across the bow of the Fredensbro, the position of the tug and hoister was such that any attempt to accept and follow the two-blast signal would have resulted in a collision of the Shipper with the tug and hoister, and that, if the course astern of the Fredensbro had been attempted, the Shipper could not with safety have altered her course to the westward and then upstream so as to pass between the stern of the Fredensbro and the piers.

On behalf of the Fredensbro, it is contended that, under the special circumstances of the case, she, being in the execution of a maneuver to turn about and go downstream, was the privileged vessel, and that her pilot was justified in proceeding with the maneuver, assuming that the Shipper would take the course astern of her.

Throughout the testimony on both sides of the controversy, it appears that the Fredensbro persisted in an attempt to exercise what her navigators considered her right to complete her maneuver, relying on the Shipper to accommodate her in so doing, regardless of the risk the Shipper would have taken of collision with the tug and tow, or with the turn to port and then to starboard which the Shipper would have been obliged to take to proceed across the river and then upstream on the western side. The Shipper, on the other hand, persisted in what her navigators considered her right to keep to the right-hand side of the stream, regardless of the movements of the Fredensbro.

With ordinary care on the part of the Fredensbro, there seems no escape from the conclusion that, if she had not persisted in going full speed ahead across the river without observing caution when her signal was not answered, the collision could have been avoided. Her pilot vigorously claimed that he could not have gone astern without danger of striking the piers on the Philadelphia side. With no obstruction whatever between her and the apparent course of the Shipper, indicated by her one-blast signal, and the pier heads on the west bank, it appears that the Fredensbro had the whole river below where she lay to herself, and there is no apparent reason why she could not have safely remained where she was when the tug and hoister passed her and drifted for a moment with the tide until the Shipper had passed her, and thus have avoided the collision.

The same sort of persistence in exercising what the Manchester Shipper considered her rights is clearly shown, and, in addition to that, there is no excuse whatever offered to show why the signals of the Fredensbro were not heard by or reported to those on the bridge of the Shipper. The chief officer heard the signal and it was not answered. It was not in the line of his duty to report it to the bridge, and he frankly confessed that he did not do so. If the signal was heard by the chief officer on the forecastle head, it would have been heard by a lookout if one had been stationed at the bow. His sole duty would have been to watch, observe, and report to the bridge, without the distraction of any other duty. If the signal had been reported and the forward movements of the Fredensbro observed, which could easily have been done by any one who was alert and watchful, the engines of the Shipper could have been reversed further down the river and the accident avoided.

■ The inevitable conclusion, therefore, is that there was fault on the part of each vessel contributing to the collision.

The facts hereinbefore found require consideration of the applicable inland pilot rules. We will cite the ones which are considered applicable.

Article 18, Rule 3 (33 USCA § 203): "If, when steam vessels are approaching each other, either vessel fails to understand the course

or intention of the other, from any cause, the vessel so in doubt shall immediately signify the same by giving several short and rapid blasts, not less than four, of the steam whistle."

Article 27 (33 USCA § 212): "In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

Article 29 (33 USCA § 221): "Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

The Fredensbro, having given the warning to the Shipper by two blasts, and having failed to get a signal of assent to the proposed starboard passage, but, in place thereof, a single blast for a port to port passage, instead of giving the danger signal required by Article 18, Rule 3 (33 USCA § 203) went ahead with her engines and did not give what she probably considered the danger signal until too late and until the collision was inevitable.

The Shipper, on the other hand, having a full opportunity of observing the fact that the Fredensbro was not on her course, but was maneuvering to get straightened out in the channel to go to sea, if she did not understand the course or intention of the Fredensbro, should have given the danger signal. If she failed to observe the movements of the Fredensbro or to hear the two-blast signal, she was in that situation because of failure to have a proper lookout, properly stationed, in violation of Article 29.

Both vessels failed to have due regard to the situation involving the dangers of collision and to the special circumstances of the situation as required by Article 27 (33 USCA § 212); the Fredensbro in going ahead and leaving to the Shipper the sole responsibility of escape from collision and of risking a possible and probable collision with the tug and tow, and of risking a passage through the narrow space between the Fredensbro's stern and the piers; the Shipper in failing to slow down and stop or reverse when her navigators knew or must have known that the Fredensbro was in the course of maneuvers to go to starboard and proceed downstream.

The collision occurred on a fair clear day in waters with which both were familiar, and between vessels which could without difficulty have observed the movements of each other for sufficient distance to have avoided the collision. The Coamo (C. C. A.) 280 F. 282; The Jason (The Westfield) 288 F. 57 (D. C.); City of Los Angeles v. Standard Transportation Company (C. C. A.) 32 F.(2d) 988; The George S. Tice (C. C. A.) 287 F. 127; The Servia, 149 U. S. 144, 13 S. Ct. 817, 37 L. Ed. 681.

On behalf of the libel filed by John Kelly, Limited, against the Manchester Shipper, in which the Fredensbro was impleaded, it was shown that the Fredensbro was chartered by her owners to the libelant, John Kelly, Limited, for a voyage from Philadelphia, Hampton Roads, or Baltimore for carriage of a cargo of coal not exceeding 4,000 nor less than 3,500 tons. The coal was shipped on the Fredensbro at Port Richmond and the voyage had commenced when the collision occurred. The master issued three bills of lading covering 3,972 tons of coal to be delivered at Belfast, Ireland, to John Kelly, Limited, the freight to be paid as per the charter party. The bills of lading issued recited that "one of the bills being accomplished, the others to stand void." The cargo, or part thereof, having been raised with the Fredensbro, the remainder was discharged at Penrose Pier and the master of the Fredensbro made delivery to the owners, whereupon the original bill of lading was surrendered to the master. The two remaining copies of the bill of lading were produced at the hearing.

The proof thus establishes the prima facie right of John Kelly, Limited, to bring suit for damages for nondelivery of the cargo in accordance with the terms of the bill of lading. Lawrence v. Minturn, 58 U. S. (17 How.) 100, 15 L. Ed. 58; The Cabo Villano (D. C.) 14 F.(2d) 978.

The next question arises from the facts shown and admitted at the hearing that John Kelly, Limited, had taken out a policy of marine insurance, and that, after the delivery of the coal in damaged condition at Penrose Pier, the underwriters had paid a sum to the libelant and had taken an assignment of all of its right and claim to the cargo, and that the underwriters are therefore the real parties to the suit. The general rule is well established that an underwriter who has paid a loss is entitled to recover what he has paid by a suit in the name of the assured against the carrier who caused the loss. Hall & Long v. The Railroad Companies, 80 U. S. (13

Wall.) 367, 20 L. Ed. 594; The Potomac, 105 U. S. 630, 26 L. Ed. 1194; The Fort Gaines (D. C.) 24 F.(2d) 849.

The damage to the Fredensbro and the Manchester Shipper having been occasioned by the fault of both vessels, a decree may be entered in favor of each vessel against the other for half damages, and the damage to the cargo having been occasioned by mutual fault, the decree will provide that the loss to the cargo, if any, be sustained in equal moieties by the two vessels. Reference will be made to a commissioner to ascertain and report the damage sustained by the several parties.