**KELLEY ISLAND LIME & TRANSPORT CO. v. CITY OF CLEVELAND et al.**
**THE HYDRO.**

No. 3332.

District Court, N. D. Ohio, E. D.

June 23, 1942.

J. Harold Traverse and Lucian Ray (of Duncan, Leckie, McCreary, Schlitz & Hinslea), all of Cleveland, Ohio, for libelant.

Kent H. Meyers and Robert J. Selzer, both of Cleveland, Ohio, for City of Cleveland.

Charles Chapla (of Davis & Young) and Meyer A. Cook, both of Cleveland, Ohio, for L. A. Wells Const. Co.

Leslie H. Vogel (of Cassels, Potter & Bentley), of Chicago, Ill., and John H. McNeal (of McNeal & McNeal) and Carl A. Schipfer (of McKeehan, Merrick, Arter & Stewart, and George Wm. Cottrell) all of Cleveland, Ohio, for Standard Accident Ins. Co. and Western Foundation Co.

FREED, District Judge.

The libelant, as the owner of the sandsucker Hydro, brought suit against the City of Cleveland to recover all of the damages which proximately resulted to her from the striking of a hidden obstruction in the Cuyahoga River allegedly placed there by the City of Cleveland while engaged in the demolition of the old Columbus Road Bridge, as the Hydro was passing through the draw of the old Columbus Road Bridge spanning the river on the night of September 12, 1939.

The City of Cleveland impleaded the Western Foundation Company alleging that it was the principal contractor hired to remove and reconstruct the bridge as well as the Standard Accident Insurance Company because of their bond to indemnify and save the City of Cleveland harmless from actions growing out of the demolition and construction work.

The Western Foundation Company and the Standard Accident Insurance Company in turn impleaded the L. A. Wells Construction Company alleging that it was hired as sub-contractor to do the work of removal of the Columbus Road Bridge.

The trial of the cause consumed twenty actual court days and the written transcript of the record is in excess of twenty-three hundred pages. Recital in minute detail of all the evidence presented is impractical and unnecessary to acquaint the parties with the court's reasons for the decision rendered, or to advise the reviewing court of the trial court's basis for the decision.

A brief summary of the evidence presented will suffice:

It appears that the Hydro, a steel, single-screw vessel, 185 feet long and 40½ feet wide, carrying a crew of twenty-five, on the clear night of September 12, 1939, coming from Fairport Harbor with a load of sand, proceeded up the Cuyahoga River, a serpentine, navigable water about 105 feet wide. She tied up at dock to permit the steamer McGean, a single-screw vessel, 480 feet long, with a 56-foot beam and 30-foot depth, carrying iron ore and coal, to go up the River ahead. About 9:40 p. m., on that night, while travelling about two to three miles an hour within the confines of the City of Cleveland, her forward end being in the draw of the old Columbus Road Bridge, she struck some obstruction on the bottom of the river.

When the Hydro's stem was some distance from the draw of the old Columbus Road Bridge she passed the scow Wellston on the starboard side without signalling the Wellston, giving the Wellston a clearance variously estimated at about 10 to 25 feet. At that point the navigable portion of the river between the Wellston and the other side of the river was 60 feet wide.

Practically all the members of the crew felt the rubbing of bottom. The Hydro lurched and rolled for a matter of a second or so. She rolled over starboard and straightened, and the crew noticed that she had a substantial list of about 5 degrees when she had just about passed through the draw.

The master of the boat ordered a sounding to be made. He received the report that water was coming in on the port side and that there was about 35 inches of water in one of her tanks. The engineer was commanded to put on the pumps and the further order was issued to put her on bank. She proceeded about one-fourth or one-half mile from the point of striking and was beached. At that point she listed starboard about 20 degrees. The cables were fastened and the master of the distressed boat sought assistance from several sources, but whatever aid arrived was in vain.

All the crew who felt the striking or rubbing testified that it appeared that the water was coming from the bottom of the

vessel. The pumps could not take care of the water, the list increased steadily, the crew was ordered to abandon the boat; soon the cables gave way and the Hydro sank at 2:45 a. m. the following morning before aid arrived to save the cargo or anything aboard ship.

The wreckmaster came on the scene and about a week after the disaster the Hydro was raised and taken into drydock. It was then the master first learned that the water had come through a hole in number one tank, on the port side on top of the bilge about 25 feet back of the stem of the Hydro, forward of the widest part of the vessel. The hole was about 6½ inches wide, 13½ inches "up and down."

The wreckmaster employed a diver to find the cause of the damage. The diver was directed by the captain of the Hydro to drag around the middle of the draw of the old Columbus Road Bridge and on September 18, 1939, the Corps of Engineers of the United States Army raised from the Cuyahoga River a segment of a turntable, a section of steel of circular arch, with a radius of 11 feet, 2 inches thick and 15 inches wide, and it was identified as a part of the old bridge. They also brought up blocks of stone which were part of the two pivot piers of the bridge. At the time they were raised the segment was not attached to the blocks of stone.

The diver found the steel segment about 10 feet from the center line of the draw of the old bridge, at about a 45-degree angle pointing upstream and jutting out into the navigable channel about 4 feet. He was not permitted to remove it by the City of Cleveland and the army engineers who, as previously stated, undertook to do it themselves. They likewise say they found the segment at 10 feet from the center line of the draw of the old bridge.

The City of Cleveland had obtained permission from the War Department to demolish the old Columbus Road Bridge and build a new one and in the consent given it was provided: "2. That all work shall be so conducted that the free navigation of the waterway shall not be unreasonably interfered with; that the present navigable depths shall not be impaired; and that the channel or channels through the structure shall be promptly cleared of all falsework, piling, or other obstructions placed therein or caused by the construction of the bridge, to the satisfaction of the said district engineer, when in his judgment the construc-tion work has reached a point where such action should be taken, and in any case not later than ninety days after the bridge has been opened to traffic."

The provisions upon the basis of which this permit was issued provided: " * * * No masonry or wrecked materials of any sort are to be dumped in the river or allowed to remain on the site and all must be removed and disposed of in a suitable manner." (Item No. 1, Sec. 1.1., Contract between the City of Cleveland and the Western Foundation Company).

The City of Cleveland then entered into contract with the Western Foundation Company to demolish the bridge and construct a new one. As part of the contract, the Western Foundation Company, as principal, and the Standard Accident Insurance Company, as surety, agreed, in part, as follows: " * * * and shall indemnify and save harmless the City of Cleveland from all suits and actions of every name and description brought against the said City, its directors, or any officer of said City, for, or on account of any injury or damage to person or property arising from, or growing out of the construction of the work in said contract specified to be done, or the doing of any of the work therein described, * * *."

The Western Foundation Company then entered into agreement with the L. A. Wells Construction Co. to demolish the bridge, which contract provided:

"Item 1

"(a) Wreck steel superstructure of bridge.

"(b) Wreck South Masonry pier complete, including removal of piling substructure and such other piling and timbers as may interfere with the construction of the South Cofferdam of new bridge.

"(c) Wreck North Masonry down to the grillage."

And further:

"All of the work described in Items 1, 2, 3, and 4 shall be done in full accordance with the plans and specifications of the owner and in full accordance with the instructions of the Owners Engineers.

"The Sub-Contractor agrees to be bound by all obligations toward the Owner which the General Contractor has assumed under his contract with the Owner in so far as they apply to the work covered by this Sub-Contract."

538

It appears that the L. A. Wells Construction Company proceeded under the supervision of the City of Cleveland to demolish the bridge. Because of the nature of the structure dynamite was used to dismantle the bridge in addition to manual and mechanical equipment, such as chisels, cranes and sledgehammers. The two turntables were removed in 16 segments. They were removed, because each segment weighed in excess of a ton, by mechanical equipment. It was one of these segments that was raised from the river in the vicinity of the old bridge. The employees of the Wells Construction Company, under supervision of the City of Cleveland, did all the work of demolishing the bridge.

Testimony was offered by employees of the Wells Construction Company who were on the scow Wellston when the Hydro passed, to the effect that the Hydro lurched and listed at some distance from the draw of the bridge and not while it was in the draw. The Wells Construction Company finished its work of demolition about a month prior to September 12, 1939. Both its employees as well as the City of Cleveland inspectors made soundings of the river to determine whether any obstruction was left and contend they found none.

Numerous witnesses were called by the respondents, the City of Cleveland and the L. A. Wells Construction Company, to show that none of their employees or inspectors either dropped or saw any stones or segments of the turntable drop into the river.

Some time after the turntable segment was raised, the government engineers, evidently at the instance of the respondent, the City of Cleveland, raised numerous other objects from the vicinity where the L. A. Wells Construction Company employees testified they saw the Hydro list and lurch.

They consisted of an old boiler, propeller, propeller shaft, the remnants of an old tug under water for some time.

Plaster replicas of part of the plate in the hull of the Hydro showing the hole, of the segment of turntable, of the propeller and of the propeller shaft, and numerous photographs of objects found in the river were offered in evidence.

Experts offered testimony on behalf of the contending parties as to which one of the objects, the turntable segment, the propeller blades or some other object punctured the hull of the Hydro. It is con-

ceded that the libelant carried insurance against loss and that it was reimbursed at least in part for the damages, full recovery having been obtained on the hull insurance. The evidence is undisputed that the libelant received authority from the insurers to bring the action.

Numerous issues are presented by the contentions of the parties, but only those which are decisive will be discussed.

In view of the recovery of insurance of part of its loss by the libelant, is it the proper party to bring this suit in its own behalf as well as in behalf of the insurers?

■ The law seeks to avoid multiplicity of suits and unnecessary duplication of litigation. It is a principle founded on clear thinking that where possible, causes of action are not to be divided and courts are not to be compelled to try the same issues several times. Controversies should be terminated as expeditiously as possible if parties are not deprived of any rights thereby.

As far back as 1876, the United States Supreme Court, in the case of The Atlas, 93 U.S. 302, at pages 310, 311, 23 L.Ed. 863, used the following significant language:

"Compensation by the wrong-doer after payment by the insurers is not double compensation, for the plain reason that insurance is an indemnity; and it is clear that the wrong-doers are first liable, and that the insurers, if they pay first, are entitled to be subrogated to the rights of the insured against the insurers.

"Support to that proposition is found everywhere; and some of the authorities go further, and decide, that the suit against the wrong-doer for the benefit of the insurer must be prosecuted in the name of the injured party. Randall v. Cockran, 1 Ves.Sen. 90; Godsall v. Boldero, 9 East, 81; Irwing v. Richardson, 1 B. & Adol. 196; Case v. Davidson, 5 Maule & Selw. 81; Clark v. Blything, 2 Barn. & Cressw. 256."

In the case of Fairgrieve v. Marine Insurance Co., 8 Cir., 94 F. 686, 688, we find the court stating the rule as follows: "This precise question was before this court in the case of Norwich Union Fire Ins. Soc. of Norwich v. Standard Oil Co. [8 Cir.] 59 F. 984, 8 C.C.A. 433, 19 U.S.App. 460, and we held there that, when an insurance company pays to the insured the amount of a loss on the property insured, it is sub-

rogated in a corresponding amount to the right of action to the insured against any other person responsible for the loss. This right of the insurance company against *such other person is derived from the insured alone, and can be enforced in his right only.* At common law, it must be asserted in the name of the insured; in a court of equity, or of admiralty, or under the modern codes of practice, it may be asserted by the insurance company in its own name, when it has paid the insured the full value of the property destroyed; but, when the value of the property destroyed exceeds the insurance money paid, the suit must be brought in the name of the insured."

Also see: Federal Ins. Co. v. Detroit Fire & Marine Ins. Co., 6 Cir., 202 F. 648, The Fredensbro, D.C., 38 F.2d 501; and The Admiral Fiske, D.C., 35 F.2d 549.

■ The conclusion is inescapable that where an injured party has recovered part of its loss from the insurers, as in this case, it may maintain an action for the entire loss against the wrongdoer in its own name.

This conclusion having been reached, the next question presented for consideration is: May the City of Cleveland be held liable for damages for a maritime tort if the evidence supports the charge that it created an obstruction in a navigable river and negligently left it there unmarked?

Section 3714 of the Ohio General Code provides as follows: "Municipal corporations shall have special power to regulate the use of the streets, to be exercised in the manner provided by law. The council shall have the care, supervision and control of public highways, streets, avenues, alleys, sidewalks, public grounds, bridges, aqueducts, and viaducts, within the corporation, and shall cause them to be kept open, in repair, and free from nuisance."

■ It is clear from the reading of the statute that a navigable river is not a highway within its meaning, and that the obligation of the City of Cleveland by virtue of its provisions does not extend to navigable waters and impose the duty of keeping the navigable waters within its municipal boundaries free of obstructions and nuisance and cleared for navigation. The problem here presented, however, involves a far different question for consideration.

■ Sound logic and correct reasoning as borne out in the decisions of the various courts on the question lead to the conclusion on the matters raised in this case: If, while the City of Cleveland was engaged in the performance of a function imposed upon it by statute, to wit: to " * * * cause them [bridges, aqueducts and viaducts] to be kept open, in repair, and free from nuisance," it caused an obstruction to be placed in the Cuyahoga River and left it there without properly marking it so as to warn navigators of the danger of its presence, then it is guilty of negligence and may be held liable for a maritime tort, and if as a result of the obstruction someone is injured, it may be held accountable in damages.

■ In order to hold the City of Cleveland liable it is not necessary to conclude that the City of Cleveland was negligent in the manner in which the offending object was placed by it in the navigable waters. Negligence and concomitant liability may arise from the placing of an obstruction without removing it or marking it.

To put it another way: The mere placing of an obstruction without warning, in and of itself, constitutes negligence and gives rise to liability upon the happening of injury resulting from the obstruction. This rule of law had been laid down as early as 1808 in the case of Harmond v. Pearson, 1 Camp. 515, in which Lord Ellenborough said: "It is a peremptory rule of navigation that, when any substance is sunk in a navigable river as to create danger, a buoy should be placed over it for the safety of the public."

In the case of Philadelphia, Wilmington & B. Railroad Co. v. Philadelphia & Havre de Grace Steam Towboat Co., 23 How. 209, 216, 16 L.Ed. 433, Justice Grier in 1859, quoted the rule in somewhat different language: "It is a rule of maritime law, from the earliest times, 'that if a ship run foul of an anchor left without a buoy, the person who placed it there shall respond in damages.' "

See, also, Atlee v. Union Packet Co., 1874, 88 U.S. 389, 21 Wall. 389, 22 L.Ed. 619.

In the case of North American Dredging Co. v. Pacific Mail Steam Ship Co., 9 Cir., 185 F. 698, at page 701, the court

stated: "An obstruction unlawfully placed, or negligently left, in a navigable waterway or harbor, causing an injury to a vessel afloat, is a maritime tort."

In this circuit the rule was applied in the case of Great Lakes Towing Co. v. Kelley Island Lime & Transport Co., 6 Cir., 176 F. 492, at page 497, where the court stated:

"The city knew of these submerged timbers for it put them there. And it should not have removed the piles or suffered them to be removed without giving warning to those navigating the river of the danger to which the removal of the piles exposed their vessels. * * *

"And it is also to be observed that the negligence of the city did not cease to be operative upon the removal of the piles. It was a continuing negligence which would become effective whenever the chance of accident should occur."

■■ The defense of the City of Cleveland that it was engaged in the performance of a governmental function is not tenable. An admiralty court, in the exercise of its proper jurisdiction by application of general principles of maritime law, may afford relief to an injured party for a maritime tort regardless of the governmental capacity of a municipal corporation.

The liability of a municipality for a maritime tort in the absence of statutory provisions has been established in the courts for several decades.

The Supreme Court of the United States at the turn of the century, in Workman v. City of New York, Mayor, etc., 179 U.S. 552, 21 S.Ct. 212, 217, 45 L.Ed. 314, enunciated the principle which has been followed to this day, that "there is no limitation taking such corporations out of the reach of the process of a court of admiralty."

■ The fact alone that the obstruction was placed in the river by contractors who were performing the work for the City of Cleveland imposed by statute on the City of Cleveland, does not relieve it of liability, but the contractor is constituted the agent of the City of Cleveland in so doing. The duty imposed is not one that may be delegated. The Sixth Circuit Court of Appeals in the case of Great Lakes Towing Co. v. Kelley Island Lime & Transport Co., supra, substantiates this view, as follows: "But here the con-

trolling fact is that the city was charged with the care, supervision, and control of the offending structure by statute. Its bridges are put upon the same footing as its streets and highways. That the duties incident to the care and control of streets and bridges are personal and absolute and cannot be devolved upon contractors is well settled in Ohio as will be seen by reference to the following decisions of the Supreme Court: Circleville v. Neuding, 41 Ohio St. 465; Covington [& C. Bridge] Co. v. Steinbrock, 61 Ohio St. 215, 55 N.E. 618, 76 Am.St.Rep. 375.

See, also, State of Maryland v. Miller, 4 Cir., 194 F. 775.

If the City of Cleveland is liable for a maritime tort, as discussed above, does the evidence preponderate that the City of Cleveland or its contractors or employees caused the segment of turntable to be dropped in the channel of the navigable waters of the Cuyahoga River?

■ The burden of proof is on the libelant to establish by a preponderance of the evidence that the respondent, the City of Cleveland, caused the obstruction to be created in the river, and that this obstruction was the causative agent for the damages sustained by it. On the state of the evidence in this case the court does not feel that it is necessary to indulge in a discussion of any theories of presumption against the respondents, or the shifting of the duty to proceed on the presumption to be drawn from the existence of the turntable segment in the river.

■ It is a well-settled principle that established facts may form the basis of a reasonable inference. This is particularly true where the established facts can be susceptible of but one reasonable inference.

In order to apply this principle to the instant case it may be well to recite the established facts:

It was proved to the satisfaction of this court that none but the City of Cleveland and its agents was engaged in the work of demolition of the bridge or the removal of the turntables from the bridge; that dynamite blasting operations were used by the City of Cleveland's agents in the demolition of the bridge; that the huge segment of turntable from the old Columbus Road Bridge was raised from the Cuyahoga River in the immediate vicinity where the bridge had been; that several large

blocks of stone which were part of the piers of the bridge, and upon which the turntable had rested, were likewise raised from the river; that each segment, and that raised, weighed in excess of 2,000 pounds; that substantially only mechanical equipment was used in the handling of the segments of the turntables which were part of the bridge because of their tremendous weight; and that the moving of a segment such as was raised from the river required eight men when manual handling was necessary.

■ These established facts give rise to no other reasonable hypothesis except that the accused obstruction in the Cuyahoga River was placed there by the City of Cleveland or its agents. In fact, they are so strong as to exclude any other reasonable hypothesis.

Evidence was offered to the effect that there were no eyewitnesses who saw the segment drop into the river. It must be evident that in cases such as this seldom, if ever, can eyewitnesses be produced who actually saw the offending object dropped into the navigable waters. The law never intended to impose such hardships on parties injured as to deprive them of a right to recover if eyewitnesses cannot be produced to show how the obstruction was created. Rules of reason and sound common sense dictate that the law's demands may be satisfied in the absence of eyewitness testimony by proof of facts from which but one reasonable inference can be drawn.

In face of the above-established facts and the necessary inference arising from them, the contentions advanced by the City of Cleveland as to how the segment got into the river, and particularly that of the L. A. Wells Construction Company, contained in its brief, that the accused segment of the turntable was not even in the river at the time the Hydro met disaster, appear so remote from possibility as to be worthy of no serious consideration. Such contentions do not affect evidence of real probative value. Judge Parker, by analogy, in the case of The New Berne, 4 Cir., 80 F.2d 244, on page 247, so aptly put it when he said: "The origin of gasoline fires must in most cases be established by circumstantial evidence; and the probative effect of such evidence ought not to be disregarded because the ingenuity of counsel may suggest a number of ways in which such fires might have originated."

■ The above principle of law as applied is amply supported by adjudicated cases. In the case of E. K. Wood Lumber Co. v. Andersen, 81 F.2d 161, at page 166, the Ninth Circuit Court of Appeals dealt with this principle as follows: "This rule has been discussed at length in Jones on Evidence (2d Ed.) § 364. There the author refers to the conflicting authorities and offers what he terms the 'true rule.' He maintains that it is consonant with enlightened common sense and that the better reasoned cases sustain the holding that a 'fact,' although arrived at by indirect or circumstantial evidence, may serve as a basis for an inference; where the evidence sustaining the first inference is of such a character and so strong that it justifies a conclusion, that is to say, that 'once the facts are established from which a presumption or inference logically flows or legally arises, whether such basic facts are established by circumstantial evidence or by direct testimony, it is the province of the jury to deduce the presumption or inference.' See Adamant Stone & Roofing Co. v. Vaughn, 7 Tenn.App. 170; Sommer v. Yakima Motor Coach Co., 174 Wash. 638, 26 P.2d 92; Chesapeake & O. R. Co. v. Ware, 122 Va. 246, 95 S.E. 183; Wigmore on Evidence, § 41."

■ In the case of National Biscuit Co. v. Litzky, 6 Cir., 22 F.2d 939, 56 A.L.R. 853, Judge Hickenlooper expressed the thought, found on page 942 of 22 F.2d: "Regardless of the doctrine of res ipsa loquitur, negligence may be established by circumstantial evidence and where the circumstances are such as to take the case out of the realm of conjecture and within the field of legitimate inference from established facts, a prima facie case is made."

In the case of The Thomas Cranage, D. C., 189 F. 1003, at page 1005, the court said: "No one saw the hatch cover at the moment it fell, and respondent claims that the burden of proof rests upon the libelant to show what actually caused it to fall; but I think the situation and the circumstances are such that it may fairly be presumed that, if the sections had been properly piled and secured, they could not have been irregularly and unevenly placed either by the crew or the stevedores, nor could they have been displaced by the movement of the boat. The fact that the section dropped into the hold is persuasive evidence of improper and insecure piling, and consequent negligence on the part of the respondent."

And on page 1006 of 189 F.: "The facts and circumstances surrounding an occurrence from which personal injury results and the nature of the act not infrequently determines the rule by which the asserted negligence may be established. But it is not necessary to decide that this is a case of res ipsa loquitur."

Also see: Wigmore on Evidence, Third Edition, Sec. 41; and Jones' Commentaries on Evidence, Volume 1, Sec. 104.

Was the turntable the obstruction which caused the damage to the Hydro?

The answer to this question must be found within the limits of the evidence pertaining to (1) the location where she struck the obstruction (2) the opinions of the experts, who examined the obstructions found in the river, as to the cause of the hole, in the hull of the Hydro and (3) the physical evidence of the plaster cast replicas of the obstructions and the damaged plate of the Hydro and the demonstrations in court showing how the various objects would or could cause the type and size of the hole.

The evidence satisfactorily established that the turntable segment was raised from the approximate location in the river where the members of the crew testified the Hydro struck an obstruction. The captain of the Hydro, in this regard, testified:

"Q. Did you or did you not assist Mr. Stanton (the diver) in attempting to locate the obstruction which your vessel had hit? A. I did.

"Q. Do you have any recollection as to when that assistance was given? A. I went with him on the following Sunday down to the Columbus Road bridge, and he had two men and a rowboat which they were dragging the river with.

"Q. What area were they dragging with respect to the draw of the bridge itself? A. Below the draw of the bridge.

"Q. Well, did they continue to drag there? A. No. I corrected them and told them to come up in the middle of the draw because that is where they would find any obstruction that I hit.

"Q. And you actually told them to move upstream, is that right? A. Yes sir.

"Q. Then where did they go, fix it as carefully as you can? A. They came to where I was standing, and that was about in the middle of the draw, and I told them to drag there." (PP. 36–37 of Record.)

And the diver stated:

"Q. This was a steel cable, Mr. Stanton? A. Yes.

"Q. You fastened one end to the turntable; where did you fasten the other end? A. Up on the top, the old spiles there, put the eye over there, drive a spike so it wouldn't slip down to the bottom, so when we come up there and get hold of that and take it up without doing any diving.

"Q. The particular spot that you were making this investigation, was that pointed out to you by anyone else before you started to work? A. Before I started?

"Q. Yes, before you went under water, did anyone tell you what particular place in the river to make your investigation? A. Yes.

"Q. Who was that? A. The Captain of the Hydro." (P. 469 of Record.)

Some witnesses who were on the scow Wellston at the time of the striking maintained that they saw the Hydro list at a place whence other obstructions were raised, at some distance removed from the draw of the bridge and in the vicinity of a cluster of piles. The court is firmly convinced that the men who were on the vessel injured were in far better position to judge. Their concern must have been for the things that occurred to or on their vessel far more than that of people to whom it was of more casual regard and whose observation must have been limited because of darkness. The men on the vessel felt the jar resulting from the striking. It became a matter of serious proportions to them. Their observation, from the viewpoint of everday human reaction to danger, of necessity, had to be more exact. In spite of the obvious, however, courts have found it necessary to comment on the weight to be given to the testimony of those on an injured vessel as compared with others not on the vessel. These decisions uniformly hold that greater weight is to be given to the testimony of the men on board as expressed in the case of The Alexander Folsom, 6 Cir., 52 F. 403, at page 411: "The established rule is that the testimony of officers and witnesses as to what was actually done on board their own vessel is entitled to greater weight than that of witnesses on other boats, who judge or form opinions merely from observation."

Also see: The Fannie, 11 Wall. 238, 20 L.Ed. 114.

Numerous experts took the witness stand, some of whom examined the boat, others who did not. Some of them prepared plaster casts of the objects themselves, others only viewed the casts.

The experts arrived at divergent opinions, some contending that the hole in the Hydro was caused by the steel segment of the turntable, others that it was caused by the propeller blade or blades raised from the river. All of the experts maintained their particular views most definitely, based on various and diverse factors they took into consideration. They admitted quite candidly, however, that no scientific experiments had been conducted on the results of metal striking metal to the extent that the question could be resolved one way or the other with definite scientific certainty. They remarked that they were expressing their own opinions as a result of their various engineering qualifications, and study they gave to the question at issue. All the expert testimony, in the final analysis, resolved itself largely into the physical demonstration and visible observation of how the offending objects fit the hole in the Hydro.

In view of the qualifications arising out of the expert testimony it must be evident that this issue can be resolved only by viewing such testimony in conjunction with the conclusive proof on the matter of the location where the Hydro struck the obstruction and the physical appearance of the objects offered in evidence.

The demonstration of the striations on the hull of the boat leading to the hole, the size of the hole, the size of the turntable segment, the manner in which the turntable segment fit into the hole as compared with the propeller blade, the markings on the segment and the propeller blade, the character and quality of the metal in the segment, the blade and other objects, in the light of the expert testimony, lead the court to the conclusion that the segment of the turntable caused the hole in the Hydro.

The contention is made by the respondents that the captain of the Hydro was at fault, and that having been guilty of a statutory violation or violations, libelant is charged with the duty of establishing that the violations not only did not, but could not have caused the injury.

The cases cited in support of this contention all pertain to instances where a collision occurred between two vessels plying navigable waters. There is no need to discuss or enumerate the statutory violations claimed because the door is closed to any conjecture on the proposition that the violations claimed could possibly have been the cause of the accident. The Hydro, without doubt, was entitled to use all of the channel of the Cuyahoga River from the Wellston to the piling on the other side of the river and had the right to assume that the river was free of dangerous obstructions. See Red Star Towing v. Snare & Triest Co., 2 Cir., 194 F. 672; Corby v. Ramsdell, 2 Cir., 48 F.2d 701. The court cannot agree with the contention that the statutory violations charged could possibly have caused the damage sustained.

It is further contended by the respondents that the sinking of the Hydro was caused by the negligence of the master of the vessel after she had struck the obstruction.

There is a homely expression that "hindsight is better than foresight." The actions of the master of the Hydro should be judged on the basis of what another navigator at that time would have done under similar circumstances. The element of excitement and inevitable confusion, with danger hovering over a master's vessel, must be taken into consideration. No doubt after the occurrence the captain thought of many things he might have done. His negligence is not to be determined from what may have been done, or what a critic after the event says should have been done after he has had an opportunity months later to evaluate it; but rather did he do everything at that time which reasonable good judgment dictated was necessary to save his ship and his crew. Mr. Justice Bradley, in The Nevada, 106 U.S. 154, at page 157, 1 S.Ct. 234, at page 237, 27 L.Ed. 149, remarked: "Perhaps they might have done something else which would have been better. The event is always a great teacher. They might have stayed out in the river and not entered the slip; or, having entered, they might have gone back to the bulk-head, and stayed there till the Nevada left. But these possibilities are not the criteria by which they are to be judged. The question is, did they do all that reasonable prudence required them to do under the circumstances? And this question, we think, must be answered in the affirmative."

The evidence points to the fact that the captain of the Hydro was an experienced navigator, fully conversant with his ship,

544

undoubtedly proud of his command, with high regard for the welfare of his crew and his vessel. He had been a steamboat master for nineteen years, and had plied the waters of the Cuyahoga River "70 to 100 times" a season. His testimony disclosed his knowledge of the river, its docks and the bridges passing over it.

There is nothing in the evidence to justify any conclusion that the master's negligence caused the sinking.

The court in an admiralty case, sitting as a trier of facts as well as the law, must realize his obligation to extract the truth from the entire case and arrive at a just conclusion. This court has reiterated this in the course of the trial which was of long duration. A careful, conscientious, painstaking analysis both of the law and the facts can lead but to one conclusion: The libelant has established the liability of the City of Cleveland for the damages to the Hydro by the required degree of proof.

The other respondents, the Western Foundation Company, the Standard Accident Insurance Company and the L. A. Wells Construction Company, were impleaded in this case. Since there appears to be little dispute, if any, among the parties that this court is empowered to determine their respective liabilities to the City of Cleveland and to each other in this action, it is needless for the court to go into a lengthy discussion concerning it. It will be sufficient to refer to Rule 56 of the Admiralty Rules, which provides in part as follows: "In any suit, whether in rem or in personam, the claimant or respondent (as the case may be) shall be entitled to bring in any other vessel or person (individual or corporation) who may be partly or wholly liable either to the libellant or to such claimant or respondent by way of remedy over, contribution or otherwise, growing out of the same matter. This shall be done by petition, on oath, presented before or at the time of answering the libel, or at any later time during the progress of the cause that the court may allow." 28 U.S.C.A. following section 723.

And Rule 15 of the Admiralty Rules of the District Court for the Northern District of Ohio, which provides:

"Third Party Practice

"If a defendant shall, by petition on oath, filed before answer, or within such further time as the Court may allow, allege fault in any other party, in respect of the matters complained of in the libel, or shall allege that he is entitled to contribution or indemnity from any other party in respect of such matters, and shall pray that such other party be brought into the suit as a party defendant in analogy with the provisions of Admiralty Rule 56 of the Supreme Court, process on such petition may be issued and the cause shall proceed otherwise as in cases under the 56th Rule."

The impleading of these respondents and the court's decision as to their respective rights would not in any way relieve the City of Cleveland of any liability to the libelant in this case. If relief is granted it must be by way of recovery over, which may be warranted because of the provisions of the respective contractual obligations of the Western Foundation Company to the City of Cleveland, as principal, the obligations of the Standard Accident Insurance Company to the City of Cleveland, as surety; and the obligations, in turn, of the L. A. Wells Construction Company to the Western Foundation Company and the Standard Accident Insurance Company.

It appears from the uncontradicted testimony that the City of Cleveland entered into a contract with the Western Foundation Company for the removal of the old Columbus Road Bridge and the construction of a new one, and that as a part of the contract, the Western Foundation Company, as principal, and the Standard Accident Insurance Company, as surety, executed and delivered to the City of Cleveland a performance bond to save the City of Cleveland harmless from any damages suffered, as fully set forth above.

The language of those provisions is so clear as to leave no room for discussion of the liability of the Western Foundation Company and the Standard Accident Insurance Company to indemnify the City of Cleveland for damages that may be found due to libelant from the City of Cleveland because of the sinking of the Hydro.

It further appears that the Western Foundation Company entered into a contract with the L. A. Wells Construction Company which was impleaded by it and its surety, the Standard Accident Insurance Company, to perform part of its contract with the City of Cleveland, and which contract included such duties and obligations as are set forth above.

It would be repetitious to recount the court's reasoning in arriving at the conclusion that the turntable segment from the old Columbus Road Bridge, which caused the injury to the Hydro, was caused to fall into the Cuyahoga River by the City of Cleveland or its agents while it was engaged in the demolition of the old bridge. From all the evidence it must be concluded that the damages sustained were occasioned in connection with the work within the provisions of the sub-contract. The liability of the L. A. Wells Construction Company is therefore clearly spelled out to the Western Foundation Company for the amount of its liability to the City of Cleveland; its obligation is likewise apparent to the Standard Accident Insurance Company, the surety, by virtue of the surety's rights to be subrogated to those of its principal if called upon to pay.

The finding of the court will be made accordingly and a special master will be designated to determine the amount of damages sustained by libelant.